J-A20012-16

2017 PA Super 235

| | |
|---|---|
| GEORGE R. BOUSAMRA, M.D. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| EXCELA HEALTH, A CORPORATION; WESTMORELAND REGIONAL HOSPITAL, DOING BUSINESS AS EXCELA WESTMORELAND HOSPITAL, A CORPORATION; ROBERT ROGALSKI; JEROME E. GRANATO, M.D., LATROBE CARDIOLOGY ASSOCIATES, INC., A CORPORATION; ROBERT N. STAFFEN, M.D.; MERCER HEALTH & BENEFITS, LLC; AND AMERICAN MEDICAL FOUNDATION FOR PEER REVIEW AND EDUCATION, INC., A CORPORATION. | |
| APPEAL OF: EXCELA HEALTH, WESTMORELAND REGIONAL HOSPITAL, ROBERT ROGALSKI, JEROME E. GRANATO, M.D., AND LATROBE CARDIOLOGY ASSOCIATES, INC. | |
| | No. 1637 WDA 2015 |

Appeal from the Order Dated October 6, 2015
In the Court of Common Pleas of Allegheny County
Civil Division at No(s): G.D. No. 12-003929

BEFORE:  BOWES, STABILE AND MUSMANNO, JJ.

OPINION BY BOWES, J.:                           **FILED JULY 19, 2017**

Excela Health, a corporation ("Excela"), Westmoreland Regional

Hospital, doing business as Excela Westmoreland Hospital, a corporation

("Westmoreland Hospital"), Robert Rogalski, Jerome E. Granato, M.D., and

Latrobe Cardiology Associates, Inc. ("Latrobe Cardiology"), filed this appeal from an October 6, 2015 discovery order. Appellants assert that the order in question required them to produce documents that are protected by the attorney-client and work-product privileges.  We affirm.

On March 1, 2012, Appellee George R. BouSamra, M.D., instituted this action against Appellants as well as Dr. Robert N. Staffen, Mercer Health & Benefits, LLC ("Mercer"), and American Medical Foundation For Peer Review And Education, Inc., a corporation ("American").  Ehab Morcos, M.D. instituted a separate action at docket number 12-3941 against the same defendants, and Dr. Morcos' lawsuit was consolidated with this lawsuit for purposes of discovery as both cases concern the same events.[1]

During the pertinent time period, Excela operated Westmoreland Hospital, which is an acute care hospital in Greensburg, Pennsylvania, Mr. Rogalski was Excela's Chief Executive Officer ("CEO"), and Dr. Granato was Chief Medical Officer for Excela.  Dr. BouSamra and Dr. Morcos were members of a private cardiology practice known as Westmoreland County Cardiology ("WCC"), and had staff privileges as interventional cardiologists

_____

[1] We note that Appellants' notice of appeal failed to include the lower court docket number or caption for Dr. Morcos' lawsuit, although the two actions were consolidated for purposes of discovery, and the order in question was captioned with both Dr. BouSamra's name and Dr. Morcos' name. Additionally, the order stated that it was entered at "NO. GD-12-003929 NO. GD-12-003941 (CONSOLIDATED)."  Order of Court, 10/6/15, at 1.

at Westmoreland Hospital. Dr. BouSamra gained medical privileges at Westmoreland Hospital in 2005 while Dr. Morcos was granted those privileges in 2006. The two doctors relinquished their staff privileges at Westmoreland Hospital on January 12, 2011.

Interventional cardiology is a subspecialty of cardiology wherein practitioners utilize intravascular catheter-based techniques to treat, *inter alia*, coronary artery disease. These specialists employ catheterization and angiography to measure the amount of blood flow through a patient's coronary arteries in order to ascertain if there is blockage restricting the blood movement. If the blockage is present and severe enough, interventional cardiologists implant a stent, and that device increases the flow of blood through the affected artery.

Dr. BouSamra claimed the following in this lawsuit. By 2006, WCC performed approximately ninety percent of the interventional cardiology procedures at Westmoreland Hospital. WCC generated most of Excela's yearly multi-million dollar income from cardiology services, a large portion of which involved interventional procedures, and the quality of WCC's services attracted patients who otherwise would have traveled to Pittsburgh. In 2007, Excela acquired Latrobe Cardiology. However, that entity did not employ interventional cardiologists and patients who needed interventional cardiac procedures were referred by Latrobe Cardiology cardiologists to other groups, including WCC.

Dr. BouSamra also averred the following. Animosity existed between the privately-owned WCC and Latrobe Cardiology because those entities competed for patients. In 2008, defendant Dr. Staffen, who was a member of defendant Latrobe Cardiology, complained to Excela that Dr. BouSamra and Dr. Morcos were not properly referring back to Latrobe Cardiology patients whom Latrobe Cardiology had referred to WCC for interventional procedures.

In this action, Dr. BouSamra additionally alleged that the following occurred. Physicians from Latrobe Cardiology began to speciously accuse WCC of various improper medical practices, including, *inter alia*, that its cardiologists were placing medically-unnecessary stents in patients. In response, in 2009, the Chief Medical Officer of Westmoreland Hospital decided to conduct an evaluation of the cardiac catheterization laboratory at Westmoreland Hospital and the practices of physicians, including Dr. BouSamra and Dr. Morcos. One of the principals of WCC, one of the cardiologists from Latrobe Cardiology, and the Chief Medical Officer of Westmoreland Hospital agreed that the evaluation of the interventional cardiology procedures performed at WCC would be performed by Dr. Mahdi Al-Bassam, a skilled interventional cardiologist.

On April 26, 2009, Dr. Al-Bassam issued a report that contained a favorable evaluation of the WCC interventional cardiologists. He found that their work demonstrated outstanding skills and judgment, there was no

misuse or abuse of the practice of interventional cardiology, and their performance of procedures involved no increased complications or mortality.

Dr. BouSamra also indicated the following in this case. After defendant Mr. Rogalski was appointed CEO of Excela, he became aware of the tension between WCC and Latrobe Cardiology. Mr. Rogalski also attempted to incorporate WCC into the Excela system. Through this endeavor, Excela planned to dominate the Westmoreland County market in interventional cardiology. WCC and Excela began negotiating. In April, 2010, WCC rejected Excela's overtures; the following month, Excela began to recruit interventional cardiologists to compete with WCC.

Dr. BouSamra claimed in this lawsuit that Excela then used Latrobe Cardiology's unfounded complaints about his and Dr. BouSamra's over-stenting to discredit them in the Westmoreland County area, as follows. In June 2010, without notice to Dr. BouSamra and Dr. Morcos, Excela engaged Mercer to conduct peer review of interventional cardiologists, including Dr. BouSamra and Dr. Morcos. Based upon Dr. Al-Bassam's 2009 evaluation outcome, Mr. Rogalski's knowledge of the rivalry between Latrobe Cardiology and WCC, and the passage of a mere two months between the rejection of Excela's offer to incorporate WCC under its umbrella and the initiation of the Mercer peer review, Dr. BouSamra averred that Mercer's 2010 peer review was pretextual and was designed to discredit Dr. BouSamra and Dr. Morcos. The outcome of the Mercer peer review, which was based upon a sampling,

indicated that Dr. BouSamra and Dr. Morcos, as well as other interventional cardiologists, had performed medically unnecessary stenting. Excela focused upon Dr. BouSamra and Dr. Morcos, who were given the results of the Mercer review on December 18, 2010. The two doctors resigned their privileges at Westmoreland Hospital on January 12, 2011, to avoid negative professional repercussions from what they perceived as an unwarranted and pretextual peer-review outcome.

Wary of the events occurring with Excela, Dr. BouSamra already had begun to look at other hospitals, and, by the time he resigned, he had gained provisional privileges to perform coronary interventions at Forbes Regional Hospital, which serves patients in Westmoreland County and eastern Allegheny County.

Before Mercer completed its peer review, Excela hired an outside public relations consultant, Jarrard, Phillips, Cate, & Hancock ("Jarrard"), to aid it in publicizing the over-stenting issues. Since the Mercer review was based upon a sampling, on February 9, 2011, Excela hired American, another outside peer review corporation, to conduct an additional peer review. American evaluated interventional procedures performed by only Dr. BouSamra and Dr. Morcos for 2010, which amounted to 753 files. The purpose of that review was to determine if any of the procedures that they performed at Excela were not medically necessary.

In this case, Dr. BouSamra also accused the American peer review of being pretextual and specifically designed to discredit him and Dr. Morcos, maintaining that American conducted its review of their 753 cases from 2010 over the course of a weekend and devoted less than ten minutes to each patient file. On February 23, 2011, American issued a report to Excela that indicated that the practice of Dr. BouSamra and Dr. Morcos was to overestimate arterial blockage and to inappropriately implant stents.

On March 2, 2011, Excela held a press conference and publicly announced that its experts had concluded that Dr. BouSamra and Dr. Morcos performed medically unnecessary stenting procedures in 2010. That press conference received wide media coverage the following day.

Dr. BouSamra and Dr. Morcos instituted their lawsuits. Their positions were: 1) the Mercer and American peer review proceedings were conducted in bad faith and were specifically intended to disparage their medical practices; and 2) Excela, in furtherance of its campaign of preventing Dr. BouSamra and Dr. Morcos from competing with it in Westmoreland County, publicly announced the unsupported findings from the two peer reviews to discredit the doctors. They raised various causes of action in the two lawsuits; they also included intentional interference with existing and potential contractual relationships and defamation.

The present appeal pertains to a discovery ruling, and the following facts are pertinent in that respect. Timothy Fedele, Esquire, was Excela's

Senior Vice-President and General Counsel (occasionally referred to as "in-house counsel") during the relevant events. Excela hired Jarrard, an independent public relations firm that is located in Nashville, Tennessee, to create a media plan to implement the public announcement about the over-stenting issues. Molly Cate was the principal at Jarrard who worked on the Excela media plan, and included on her team were Tim Fox, Alan Taylor, and Magi Curtis.

On February 25, 2011, Ms. Cate was told by Excela that legal issues prevented public disclosure of the names of the doctors who implanted unnecessary stents. On February 26, 2011, outside counsel transmitted advice to Mr. Fedele by means of an email. On February 26, 2011, Mr. Fedele forwarded that email to Ms. Cate[2] and management level employees at Excela. Ms. Cate forwarded Mr. Fedele's email, which included in its chain the email authored by outside counsel, to the other three members of the Jarrard team. On February 28, 2011, Excela told Ms. Cate that, at the press conference planned for March 2, 2011, Dr. BouSamra and Dr. Morcos would be publicly named as the cardiologists who over-stented.

The issue in this appeal is whether Dr. BouSamra and Dr. Morcos are entitled to view the February 26, 2011 email from outside counsel to Mr.

_____

[2] The master suggested that Mr. Fedele provided outside counsel's email to the entire team working at Jarrard. However, Mr. Fedele gave outside counsel's email only to Ms. Cate, who forwarded it to her team.

Fedele, and certain emails generated in response to that email. On November 18, 2014, special master Marvin A. Fein was appointed herein to resolve all discovery disputes. Excela created a privilege log, which referenced the February 26, 2011 email from Mr. Fedele to Ms. Cate and various management level Excela personnel, which included outside counsel's February 26, 2011 email. The log also listed various emails generated among the members of the Jarrard team, as well as an email Ms. Cate sent to a management level executive at Excela and copied to Mr. Fedele. These emails will be collectively referred to as the "Jarrard documents."

A motion to compel Excela to produce the Jarrard documents was presented. In response, Appellants asserted that both the attorney-client and the work-product privileges applied. Appellees countered that the attorney-client and work-product privileges with respect to the Jarrard documents was improper due to the fact that Excela waived any privilege when Mr. Fedele forwarded outside counsel's email to Ms. Cate, a third party. The special master conducted an *in camera* review of the emails and, on May 16, 2015, concluded that, although the February 26, 2011 email from outside counsel to Mr. Fedele would probably have to be produced eventually, the email was subject to the attorney-client privilege. The special master did not discuss the work-product privilege.

Dr. BouSamra filed exceptions to that ruling. On October 6, 2015, after reviewing the emails *in camera*, the trial court concluded that the attorney-client privilege was waived when Mr. Fedele sent outside counsel's email to a third party, Ms. Cate of Jarrard. The trial court reasoned as follows:

> A communication between counsel and a third party is not protected by the attorney-client privilege. Also, the privilege is lost when a protected communication is shared with a third person. There is an exception where a third party acting as an agent of a lawyer is facilitating the lawyer's representation. See Restatement of the Law Governing Lawyers § 70 (2000), which reads as follows:
>
>> Privileged persons within meaning of § 68 are the client (including a prospective client), the client's lawyer, agents of either who facilitate communications between them, and agents of the lawyer who facilitate representation.
>
> This exception does not apply because persons with Jarrard Phillips Cate & Hancock were not agents of defendants' counsel facilitating the representation. They were retained by Excela to assist Excela in public relations matters.
>
> It was not the role of defendants' counsel to make decisions regarding communications with the public. At the most, a lawyer will give advice to a client asking the lawyer to advise it regarding legal issues with respect to communications with the public. The presence of Jarrard would not in any way assist counsel in giving such legal advice.

Trial Court Opinion, 10/6/15, at 1-2.

Appellants filed the present appeal in Dr. BouSamra's action from the October 6, 2015 order. They advance these issues for our review.

- 10 -

1. Does attorney-client privilege apply to a company's email with its media consultants, if the emails contain the advice of outside counsel and seek feedback so that in-house counsel may give legal advice to the company CEO on the appropriate course of action?

2. Does the work product doctrine protect the mental impressions of outside counsel contained in the email?

Appellants' brief at 9.

Initially, we note that we have jurisdiction over this appeal under Pa.R.A.P. 313,[3] which embodies the collateral order doctrine. Herein, the order in question compelled discovery of materials that Appellants assert are privileged under the attorney-client and work-product privileges. When a discovery order requires the production of materials that the appealing party has asserted are privileged, Pa.R.A.P. 313 applies, and we will accept jurisdiction. *See e.g.*, *Yocabet v. UPMC Presbyterian,* 119 A.3d 1012, 1016 n.1 (Pa.Super. 2015) (holding that discovery order was appealable

---

[3]   That rule of appellate procedure embodies the collateral order doctrine and provides:

   (a)   General Rule. An appeal may be taken as of right from a collateral order of an administrative agency or lower court.

   (b)   Definition.  A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313.

- 11 -

since the appellant asserted that order required it to reveal documents purportedly protected under the peer-review and attorney-client privileges and stating that if "a party is ordered to produce materials purportedly subject to a privilege, we have jurisdiction under Pa.R.A.P. 313"); ***Red Vision Sys., Inc. v. Nat'l Real Estate Info. Servs., L.P.***, 108 A.3d 54, 59 (Pa.Super. 2015) (citation omitted) ("Appellate review is appropriate when a colorable claim of privilege is asserted.").

As to the applicable standard of review, our Supreme Court articulated in ***In re Thirty–Third Statewide Investigating Grand Jury***, 86 A.3d 204, 215 (Pa. 2014), "Whether the attorney-client privilege or the work product doctrine protects a communication from disclosure is a question of law." Thus, our standard of review is *de novo* and our scope of review is plenary. ***Id***.

The attorney-client privilege was derived from the common law, ***id***., and was codified at 42 Pa.C.S. § 5928, which states: "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, **unless in either case this privilege is waived** upon the trial **by the client**." (Emphases added). We also note that

> Evidentiary privileges are not favored. Exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth. Thus, courts should accept testimonial privileges only to the very limited extent that permitting a refusal to testify or

excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.

*Red Vision*, *supra* at 61 (citation omitted).  To invoke the attorney-client privilege, a party must establish these four elements:

> 1) The asserted holder of the privilege is or sought to become a client.
>
> 2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.
>
> 3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.
>
> 4) **The privilege** has been claimed and **is not waived by the client**.

*Id*. at 62–63 (emphases added; citation omitted).[4]

As articulated in *Carbis Walker, LLP v. Hill, Barth & King, LLC*, 930 A.2d 573, 578–79 (Pa.Super. 2007), the attorney-client privilege is waived "when the communication is made in the presence of or communicated to a third party[.]"  In asserting that it did not waive the privilege, Excela first relies upon the proposition that, if a communication protected by the

---

[4] After *in camera* review, we conclude that the email from outside counsel to Excela's in-house counsel was subject to the attorney-client privilege.  *See Gillard v. AIG Ins. Co.*, 15 A.3d 44 (Pa. 2011) (communication from a lawyer to client is subject to privilege).  The only issue we address is whether Excela waived the privilege by disseminating it to Jarrard.

attorney-client privilege is disseminated to members of a team involved in offering legal advice to the client, the privilege is not waived. Principally, Excela relies upon **United States v. Kovel**, 296 F.2d 918 (2nd Cir. 1961), maintaining, "Courts and commentators alike refer to **Kovel** as the 'landmark' or 'seminal' case on attorney-client privilege as applied to agents." Appellants' brief at 24. In **Kovel**, a law firm specializing in tax law hired a former Internal Revenue Service agent with accounting skills to help it give legal advice to a client. The issue was whether communications between the client and accountant were subject to the attorney-client privilege. In concluding that the privilege applied, the Second Circuit recognized that communications between a client and a third party are privileged if the third party was employed to facilitate the legal advice rendered by the lawyer. It analogized the matter to the scenario where an interpreter is needed by a lawyer to translate a client's language, when the privilege would undoubtedly apply:

> This analogy of the client speaking a foreign language is by no means irrelevant to the appeal at hand. Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, **whether hired by the lawyer or by the client**, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege, any more than would that of the linguist . . . of the foreign language theme discussed above; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit. By the same token, if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an

accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege[.]

*Id*. at 922 (footnote omitted; emphasis added).

Initially, we note that, in Pennsylvania, it is established that "the attorney-client privilege does extend to an agent **of an attorney** who assists in the provision of legal advice to the client." ***Commonwealth v. DuPont***, 730 A.2d 970, 977 (Pa.Super. 1999) (emphasis added). Jarrard admittedly was hired by Excela, the client, rather than outside counsel. Excela is thus asking this Court to expand the privilege to encompass a client's outside agents. This scenario has not been addressed in Pennsylvania.

Initially, we observe that the attorney-client privilege applies to a corporation differently than to an individual. As we noted in ***Yocabet****, **supra**,

> A corporation is a creature of legal fiction, which can act or "speak" only through its officers, directors, or other agents. Where a representative for a corporation acts within the scope of his or her employment or agency, the representative and the corporation are one and the same entity, and the acts performed are binding on the corporate principal.
>
> Thus, the board of directors of a corporation, in addition to its officers, can act on its behalf for purposes of application of the attorney-client privilege.

***Yocabe****t, 119 A.3d at 1028.

In **Yocabet**, we ruled that high-ranking officials, the board of directors, and the officers of a corporation are considered part of the corporation for purposes of application of the attorney-client privilege. Similarly, in **Red Vision**, **supra** at 60, we observed: "The administration of the attorney-client privilege in the case of corporations presents special problems. As an inanimate entity, a corporation must act through agents." Thus, "A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals **empowered to act on behalf of the corporation**." **Id**. (Emphasis added). In that case, we ruled that those individuals included managers, officers, and directors.

In the present case, the record does not support a finding that Jarrard falls within the parameters of corporate employees or agents entitled to attorney-client protection under the reasoning of either **Yocabet** or **Red Vision**. It was not part of the board of directors or Excela's management, nor was it an official or officer with Excela. Instead, Jarrard was an independent business entity operating on a national level with numerous clients, one of which was Excela. Essentially, then, Excela is asking us to expand the scope of the attorney-client privilege and apply it to any entity hired by a corporation to aid it with a project, whether or not the agent is

part of the corporate organization. In so doing, it asks us to apply the reasoning of **Kovel**.

Pursuant to **Kovel**, the attorney-client privilege attaches to an agent of the client in two instances: where the presence of that agent is necessary or, at the very least, useful for purposes of the lawyer's dissemination of legal advice or where the lawyer directed the client to contact the agent so that the lawyer could give better legal advice. In its brief, Excela relies upon the first principle and maintains that Jarrard was necessary or useful for purposes of dissemination of legal advice on the legal issue involved herein. **See** Appellants' brief at 20 ("the attorney-client privilege applies to an in-house lawyer's communication with the outside media consultants designed to assist in providing **legal advice** to the company"); **Id**. (Mr. Fedele maintained confidentiality in outside counsel's email because he, as inside counsel, sent outside counsel's email to the media firm in order to solicit "advice from Jarrard so that he could advise Excela on the **legal risks** associated with the content of the public disclosure.") (Emphases added in both instances).

After careful review of the certified record and *in camera* review of the emails in question, we have decided that the reasoning of **Kovel** is inapplicable in this matter. We find that the record conclusively establishes that Jarrard was uninvolved in the legal issue in question. Contrary to Excela's assertions on appeal, Mr. Fedele's February 26th communication to

- 17 -

the outside media consultant was not designed to gain Jarrad's assistance in providing **legal** advice to the company nor did Mr. Fedele send outside counsel's email to the media firm in order to solicit advice from Jarrard so that counsel could advise Excela on the **legal** risks associated with the content of the public disclosure. Additionally, Jarrard failed to render any input into the question. We therefore do not need to address whether the attorney-client privilege in Pennsylvania should be expanded to encompass outside agents of the client under the reasoning employed in *Kovel*.

We first review the deposition of Ms. Cate, who reported the following. Jarrard, Phillips, Cate & Hancock was formed in 2006 in Nashville, Tennessee. Ms. Cate is a partner and part owner of the company. Ninety percent of Jarrard's work is "with hospitals and health systems, and organizations that are in the business of providing care to patients." Deposition of Molly Cate, 6/24/14, at 12. Jarrard works with those entities "through times of significant challenge or transformation or change," including "[m]ergers and acquisitions; crisis communications; issue management, reputation building; . . . communication engineering, [and] government relations." *Id*. at 13. While based in Nashville, Jarrard has clients nationwide, and Excela was "a client of Jarrard." *Id*. at 15.

From 2007 through 2010, Jarrard had given Excela media advice concerning specified issues: 1) helping its CEO unveil a strategic plan for the organization; 2) acquisition of a hospital; 3) the closing of that hospital; 4)

managing personnel in Excela's communications/marketing/public relations department on an interim basis until Excela found a leader, Alexandra Piper-Jones, for the department; 5) after Ms. Piper-Jones left at the end of 2010, again managing personnel in Excela's communications/marketing/public relations department on an interim basis and recruiting a new leader for the department, which employed several individuals; and 6) working on the public relations aspect of the over-stenting issue involved in this case.

Excela hired Jarrard to help with the disclosure of over-stenting towards the end of 2010, before the Mercer peer review was completed. Jarrard's primary contact on the project was the head of human resources, John Caverno. Ms. Cate also communicated with Mr. Rogalski, Dr. Granato, Michael Busch, who was a Vice-President and the Chief Operating Officer, and in-house counsel Mr. Fedele. Dr. Granato was consulted for advice on the medical issues involved in this matter. Jarrard was paid a monthly retainer for its work on the over-stenting controversy.

Jarrard performed the following specific work in connection with the over-stenting problem. It prepared anticipated questions and proposed answers, which were given to Excela's leadership, that would be asked at the press conference. It authored a press release to reveal the results of the audit to the media, communications to elected officials and community leaders, and letters to patients, primary care physicians of the patients, employees and volunteers of Excela, and Excela's former CEO and trustees.

Jarrard also created a timetable for distribution of information to the media, a protocol for hospital staff if they received calls from the media, and a hotline with operators for calls from patients. Jarrard arranged the March 2, 2011 public press conference where it was announced that Dr. BouSamra and Dr. Morcos had improperly implanted stents in their patients. Jarrard also set up a meeting before that public press conference with a reporter from a prominent area newspaper "to shorten the news cycle and control the message." *Id*. at 65*.* After the press conference, Jarrard monitored the ensuing media coverage. Finally, Jarrard oversaw the release of the results of the American peer review.

Ms. Cate indicated that Jarrard was hired to protect Excela's reputation in the community, which was her sole concern. Her discussions with Excela personnel about the public announcement centered on whether the contents of the public announcement would aid or be detrimental to Excela's reputation in the community. *Id*. at 108. Ms. Cate recommended that there be a public announcement in the form of a press conference about Mercer's anticipated finding that there was over-stenting since the failure to publicly announce the problem might damage Excela's reputation. *Id*. at 109.

As noted, Jarrard personnel created for Excela's senior management a list of anticipated questions that would be asked at the press conference. Ms. Cate testified that as of February 25, 2011, question three on the list of "hot button questions" was, "Who are the reviewed physicians?"; the answer

as of February 25, 2011, was, "We are not publicly identifying the physicians.[.]" *Id*. at 134. Question five on the list was "Why is the hospital not publicly identifying the physicians?"'; the answer was, "Legal issues prevent us from publicly identifying the physicians." *Id*. at 135. Ms. Cate said that she had extensive discussions with Excela management about whether the doctors were to be named. She also unequivocally testified that someone from Excela prepared the answer indicating that the doctors were not going to be named due to legal issues. *Id*. at 136. She was unable to recall who it was:

> Q.     . . . .
>
> Now, who was it that told you that there were legal issues that prevented you from publicly identifying the physicians, **or is that something that you just chose to write in there yourself based on your experience**?
>
> A. **I don't remember who told us that**. It was a topic of discussion, whether we were going to name them or not. But I don't remember specifically who gave us this language.
>
> Q. **Well, who – who was it that said that there's a legal issue that prevents you from publicly disclosing them**?
>
> A. I just—I don't remember who exactly there.
>
> Q. **Was it somebody in Excela**?
>
> A. **Yes**.

*Id*. at 135-36 (emphases added).

Ms. Cate reported that sometime between February 25, 2011 and February 28, 2011, Mr. Rogalski changed the answers to questions three and

five and decided that the doctors were to be named. *Id*. at 135. Ms. Cate's deposition confirmed that a defamation attorney, *i.e.*, outside counsel, had been consulted by February 27, 2011. *Id.* at 144. Ms. Cate indicated that a Jarrard team member suggested calling outside counsel, but Ms. Cate consciously decided not to speak with outside counsel. She stated: "Ultimately it's [Excela's] decision to make." Ms. Cate confirmed at her deposition that "it wasn't up to [her] to decide whether you were going to identify the docs[.]" *Id*. at 145.

At his deposition, Mr. Fedele did not indicate that he consulted with Jarrard about the legal implications of using the doctors' names at the press conference. Indeed, Mr. Fedele stated that he did not recall having **any** dialogue "with Jarrard, Cate, Phillips between the 25th of February to the 28th of [February] eliminating the question regarding the **legal issues** preventing publicly identifying the physicians[.]" Deposition of Timothy Fedele, 7/23/14, at 190 (emphasis added). Moreover, Mr. Fedele indicated that he did not regularly speak with members of Jarrard, and their primary contact was with Mr. Caverno. *Id*. at 165.

At his deposition, Mr. Rogalski acknowledged that sometime between February 25th and February 28th there was a change in Excela's position as to whether to name the doctors. He confirmed Ms. Cate's deposition testimony that he made the decision to name the doctors. When questioned about what caused the change, Mr. Rogalski was evasive but definitively

stated that Ms. Cate was uninvolved in the discourse of the **legal** issue in question. Specifically, when asked what happened between February 25 and 28 to cause Jarrard to go from believing legal issues prevented the disclosure of the doctor's name to naming those doctors, Mr. Rogalski refused to answer the posited question and instead, responded that he did not believe that the answer was material because, "I mean, **we** made a decision to name them during that time period." Deposition of Robert Rogalski, 10/30/14, Volume II, at 474 (emphasis added).

Our *in camera* review of the Jarrard documents confirms that Jarrard was not involved in outside counsel's dissemination of advice. Mr. Fedele emailed outside counsel a copy of the documents related to the upcoming public announcement. Of critical importance herein is that the record establishes, through the depositions of Mr. Rogalski and Ms. Cate, that Excela, not Jarrard, prepared the response to question five of the hot button issues, which response was that legal issues prevented public disclosure of the names of the doctors who allegedly over-stented. That, of course, is the "legal issue" involved in this case. Outside counsel reviewed the materials sent by Mr. Fedele and outside counsel rendered advice as to their contents. Outside counsel sent his advice only to in-house counsel. Outside counsel's email does not solicit input.

After the email from outside counsel was sent to Mr. Fedele on February 26, 2011, Mr. Fedele forwarded outside counsel's email to

management level employees of Excela and Ms. Cate of Jarrard. Mr. Fedele's email invited discussion but did not seek feedback[5] from Jarrard on the **legal** issue involved. Instead, it invited discussion as to what to do **based upon** counsel's advice.

After analysis of the pertinent emails, we reject Excela's position that the attorney-client privilege applies to Mr. Fedele's communication with Ms. Cate because the email was designed to solicit her assistance with Mr. Fedele's provision of "legal advice to the company." Appellants' brief at 20. We likewise discount its averment that Mr. Fedele maintained confidentiality in outside counsel's email because he sent outside counsel's email to Ms. Cate in order to solicit advice from Jarrard so that Mr. Fedele could advise Excela on the "legal risks associated with the content of the public disclosure." *Id*. Mr. Fedele was not asking for input from Jarrard into the legal advice proffered by outside counsel; it solicited input for implementing the legal advice already rendered by outside counsel. While the other

---

[5] We would not have discussed any of the contents of the Jarrard documents. However, in its statement of issues involved in this appeal, Excela has represented that the attorney-privilege applies because, in their emails, in-house counsel and outside counsel sought feedback from its recipients, including Jarrard, so that in-house counsel could give legal advice to the company CEO on the appropriate course of action. Since the party seeking invocation of the attorney-client privilege advances the position that Mr. Fedele and/or outside counsel solicited feedback in their emails so they could render legal advice to Excela, we are constrained to analyze the truth of that position.

recipients of Mr. Fedele's February 26th email were management level decision makers on the issue of whether to name the physicians in question after consideration of outside counsel's advice, Ms. Cate was not a corporate-decision maker, as defined by *Yocabet* and *Red Vision*.

Ms. Cate, in turn, sent in-house counsel's email, to which outside counsel's email was attached, to the three other members of her team. That team commented amongst themselves, but did not communicate with outside counsel or anyone from Excela about outside counsel's email. One high-level executive of Excela emailed Ms. Cate about outside counsel's advice after February 26, 2011, and Ms. Cate's response to that executive, which was copied to Mr. Fedele, did not contain a scintilla of input, advice, criticism, or analysis of the legal question involved. It is consistent with her deposition that she acquiesced in the decision of the corporate management empowered to make that determination.

Mr. Rogalski confirmed Ms. Cate's deposition testimony. He refused to answer the question as to what caused Jarrard to change the public announcement between February 25th and February 28th from not naming the doctors to naming the doctors. He stated that the answer to that question was irrelevant because Jarrard was not involved in the decision to name the doctors. Finally, contrary to Excela's assertion on appeal, Jarrard did not **need** to see the email from outside counsel, Appellants' brief at 30; it merely needed to be told to name the doctors. Hence, *Kovel's* reasoning

does not apply in the first instance because Jarrard was uninvolved in the rendition of legal advice on the question at issue. Given these facts, we do not need to decide whether an agent of the client can fall within the penumbra of the attorney-client privilege under the reasoning employed in *Kovel*.

Furthermore, there is case law rejecting the notion that an outside public relations firm can fall within the parameters of the attorney-client privilege even if the public relations firm is actually involved in the legal decision-making process. In *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 431 (S.D.N.Y. 2013), the Court was applying New York law, which has an "agency exception" to the disclosure of privileged communications to third parties where the disclosure is "necessary for the client to obtain informed legal advice." In the *Egiazaryan* case, the plaintiff sued a writer for defamation, and the writer counter-sued. The writer sought discovery of communications between the plaintiff and a public relations firm, and the plaintiff asserted the attorney-client privilege in the communications. The plaintiff proffered evidence that the public relations firm actively participated in the legal strategy and advice sessions with the attorney.

Despite this proof, the court in *Egiazaryan* concluded that the plaintiff failed to establish that the public relations consultant, in contrast to a translator or an accountant in a tax case, was necessary to facilitate communications between the plaintiff and his lawyer. The federal court

explained that, in order to be needed, the advice must be more than useful, and, instead, the involvement of third party must be either virtually indispensable to the legal advice or must specifically facilitate attorney-client communications. It held that the decision to insert the public relations consultant in the legal decisions did not render that consultant's involvement **necessary** to obtaining legal advice. *See also Behunin v. Superior Court*, 215 Cal. Rptr. 3d 475 (Cal.App.2Dist. 2017).

Excela relies upon various federal cases that have ruled that the attorney-client privilege is not waived when the privileged communication is disseminated to a public relations firm where the firm was the functional equivalent of an employee of the client due to the degree of work performed for the client by the firm or due to the close association between the outside public relations firm and the client. *See F.T.C. v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) (documents disseminated to public relations firm were protected by attorney-client privilege and privilege was not waived where the corporation demonstrated that corporate counsel worked with public relations consultants in same manner as it did with full-time employees and the consultants were integral members of the team assigned to deal with litigation and had to sign non-disclosure agreements); *In re Bieter Co.*, 16 F.3d 929, 938 (8th Cir. 1994) (independent consultant's relationship with client justified application of attorney-client privilege to consultant where consultant was involved daily with principals of corporation

formed with the only one objective and where consultant was "intimately involved in the attempt to achieve that objective"); *In re Copper Market Antitrust Litigation*, 200 F.R.D. 213 (S.D.N.Y. 2001) (public relations firm that regularly conferred with the client's litigation counsel in preparing press releases and other materials incorporating the lawyer's advice was the "functional equivalent" of an in-house public relations department).

Herein, the record establishes that Jarrard was not treated as the functional equivalent of one of Excela's employees or of its public relations department. Ms. Cate outlined that, over the course of a three-year period, Jarrard was hired to work on six specific projects, including the one at issue. Excela had a staffed communications/marketing/public relations department. Excela was utilizing Jarrard for a situation requiring crisis management. In this Commonwealth, whether a person/entity is an employee is determined largely by whether the employer had "control over the work to be completed and the manner in which it is to be performed." *Universal Am-can, Ltd. v. W.C.A.B. (Minteer)*, 762 A.2d 328, 333 (Pa. 2000). Similarly, the Restatement of Employment Law provides:

(a) Except as provided in §§ 1.02 [volunteers] and 1.03 [controlling owners], an individual renders services as an employee of an employer if:

(1) the individual acts, at least in part, to serve the interests of the employer;

(2) the employer consents to receive the individual's services; and

(3) **the employer controls the manner and means by which the individual renders services, or the employer otherwise effectively prevents the individual from rendering those services as an independent businessperson**.

(b) **An individual renders services as an independent businessperson and not as an employee when the individual in his or her own interest exercises entrepreneurial control over important business decisions**, including whether to hire and where to assign assistants, whether to purchase and where to deploy equipment, and whether and when to provide service to other customers.

Restatement of Employment Law § 1.01 (emphases added).

Ms. Cate's deposition proved that Jarrard had control over the project for which it had been hired (publicizing the expected results of the Mercer peer review that there was over-stenting in 2010 by interventional cardiologists at Westmoreland Hospital) in a manner that would protect Excela's reputation in the community. Jarrard prepared the materials and implemented the methods for achieving this goal. It was an independent business entity that had clients nationwide, and was hired by Excela intermittently to handle specific projects. Jarrard was not the functional equivalent of Excela's employee nor did it function as Excela's in-house public relations department.

We thus conclude that the record establishes that Jarrard was uninvolved in the legal decision-making process as to whether to name the doctors at the March 2, 2011 press conference. We also rule that Jarrard

was not the functional equivalent of an employee or Excela's public relations department during the pertinent events. Likewise, Jarrad was not one of the persons empowered to act on behalf of and bind Excela as outlined in *Yocabet* and *Red Vision*. We therefore affirm the trial court's ruling that, by sending outside counsel's email to Jarrard, a third party, Excela waived the attorney-client privilege applicable to the Jarrad documents.

Excela next asserts the work-product privilege applied to the February 26, 2011 email sent by outside counsel to Mr. Fedele.[6] As the Court noted in *In re Thirty–Third Statewide Investigating Grand Jury*, *supra*, the work-product privilege is embodied in Pa.R.C.P. 4003.3.[7] Our Supreme

---

[6] In the interest of judicial economy, we will review the issue, even though it was not considered by the special master or the trial court, since application of the work-product privilege, as noted in the text *supra*, is a question of law.

[7] Pa.A.C.P. 4003.3 states:

> Subject to the provisions of Rules 4003.4 and 4003.5, a party may obtain discovery of any matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her attorney, consultant, surety, indemnitor, insurer or agent. The discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories. With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics.

Court further observed in ***Lepley v. Lycoming Cty. Court of Common Pleas***, 393 A.2d 306, 310 (Pa. 1978), that work product is "not protected against compelled disclosure by the U.S. Constitution, any statute, or any common-law privilege[.]" The work product privilege, being a creation of the rules of civil procedure, thus must be analyzed in accordance with the parameters set forth therein. We also remain mindful that evidentiary privileges are not favored as they are in derogation of the search for the truth.

The party invoking the work-product privilege must initially delineate the facts showing that the privilege has been properly invoked; once that party does so, the burden shifts to the party seeking disclosure to establish that revealing the information will not violate the privilege. ***T.M. v. Elwyn, Inc.***, 950 A.2d 1050, 1063 (Pa.Super. 2008). We conclude that Excela has not delineated facts showing that the privilege has been properly invoked herein. The comment to Rule 4003.3 states, "The essential purpose of the Rule is **to keep the files of counsel** free from examination by the opponent, **insofar as they do not include** written statements of witnesses, **documents or property which belong to the client** or third parties, or other matter which is not encompassed in the broad category of the 'work product' of the lawyer." Pa.R.C.P. 4003.3, Explanatory Comment–1978 (emphases added).

In this case, Dr. BouSamra is not attempting to discover any item from the file of outside counsel, whose identity has been hidden from Dr. BouSamra. Dr. BouSamra, concomitantly, is not demanding that the lawyer reveal the email. Dr. BouSamra is seeking that email directly from the client Excela, the email was sent to the client Excela by outside counsel, and the email is a document that belonged to Excela. The email from outside counsel was subject to the attorney-client privilege, which was waived when Excela sent it to a third party.

Excela's position on appeal is straightforward: the work product privilege cannot be waived when work product is disseminated to a third party or witness as such disclosures are often needed to enable the attorney to prepare for litigation and since work product distributions to witnesses and third parties are not inconsistent with the purpose of the work product doctrine. Excela maintains that the work product privilege can be waived only when distributed to an adversary or under circumstances where there is a substantial increase in a potential adversary's opportunities to obtain the information. Appellants' brief at 32-33. *See Barrick v. Holy Spirit Hosp. of the Sisters of Christian Charity*, 32 A.3d 800, 812 (Pa.Super. 2011), *aff'd by an equally divided court sub nom. Barrick v. Holy Spirit Hosp. of Sisters of Christian Charity*, 91 A.3d 680 (Pa. 2014) (work-product privilege applies to communications sent by a lawyer to a witness in order to prepare that witness for trial).

However, the principles invoked by Excela are not relevant herein. Outside counsel, the lawyer, did not use the email to aid him/her in preparing for litigation by disclosing its contents to a third party or witness. Outside counsel would not have waived his privilege in his own work product if he had given it to Jarrard to aid outside counsel in preparing this case for trial. That did not occur in this case. The client sent the email, and the email was not sent by Excela to Jarrard to help outside counsel in preparing a case for trial.

Order affirmed. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/19/2017