IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| GEORGE R. BOUSAMRA, M.D. | : | No. 5 WAP 2018 |
| | : | |
| | : | Appeal from the Order of the Superior |
| v. | : | Court entered July 19, 2017 at No. |
| | : | 1637 WDA 2015, affirming the Order |
| | : | of the Court of Common Pleas of |
| | : | Allegheny County entered October 6, |
| EXCELA HEALTH, A CORPORATION; | : | 2015 at No. G.D. 12-003929, and |
| WESTMORELAND REGIONAL | : | remanding. |
| HOSPITAL, DOING BUSINESS AS | : | |
| EXCELA WESTMORELAND HOSPITAL, | : | |
| A CORPORATION; ROBERT ROGALSKI; | : | ARGUED:  October 24, 2018 |
| JEROME E. GRANATO, M.D.; LATROBE | : | |
| CARDIOLOGY ASSOCIATES, INC., A | : | |
| CORPORATION;  ROBERT N. STAFFEN, | : | |
| M.D.; MERCER HEALTH & BENEFITS, | : | |
| LLC; AND AMERICAN MEDICAL | : | |
| FOUNDATION FOR PEER REVIEW AND | : | |
| EDUCATION, INC., A CORPORATION | : | |
| | : | |
| | : | |
| APPEAL OF: EXCELA HEALTH, | : | |
| WESTMORELAND REGIONAL | : | |
| HOSPITAL, ROBERT ROGALSKI, | : | |
| JEROME E. GRANATO, M.D., AND | : | |
| LATROBE CARDIOLOGY ASSOCIATES, | : | |
| INC. | : | |

## OPINION

**JUSTICE MUNDY**                              **DECIDED:  JUNE 18, 2019**

In this appeal by allowance, we consider whether Excela Health waived the

attorney work product doctrine or the attorney-client privilege by forwarding an email from

outside counsel to its public relations and crisis management consultant, Jarrard, Phillips,

Cate & Hancock. We conclude that the attorney work product doctrine is not waived by disclosure unless the alleged work product is disclosed to an adversary or disclosed in a manner which significantly increases the likelihood that an adversary or anticipated adversary will obtain it. Accordingly, we remand this matter to the trial court for fact finding and application of the newly articulated work product waiver analysis. Further, we affirm the Superior Court's finding that Excela waived the attorney-client privilege.

George R. BouSamra, M.D. (BouSamra), along with his colleague, Ehab Morcos, M.D. (Morcos), were members of Westmoreland County Cardiology (WCC), a private cardiology practice located in Westmoreland County.[1] BouSamra and Morcos are interventional cardiologists, who use intravascular catheter-based techniques to treat, among other things, coronary artery disease. Interventional cardiologists utilize catheterization and angiography to measure blood flow through patients' coronary arteries and evaluate the presence of blockages. If a blockage is severe enough, interventional cardiologists implant a stent--a device which increases the blood flow through the affected artery by widening the narrowed section.

Westmoreland Regional Hospital is operated by Excela Health (Excela), a corporation. As of 2006, approximately 90% of the interventional cardiology procedures at Westmoreland Regional Hospital were performed by WCC. As a result, most of the income Excela realized from interventional cardiology procedures at Westmoreland Regional Hospital stemmed from WCC's procedures.

In 2007, Excela acquired Latrobe Cardiology (Latrobe). Although Latrobe was a cardiology practice, it did not employ interventional cardiologists. Instead, Latrobe referred its patients requiring interventional cardiac procedures to other cardiologist

_____

[1] Like the Superior Court, we rely on the facts as alleged by BouSamra in his complaint because a factual record has not yet been established by the trial court.

groups, including WCC. Because WCC and Latrobe competed for patients, some animosity existed between the practices.

In 2008, Dr. Robert N. Staffen (Staffen), a member of Latrobe, complained to Excela that BouSamra and Morcos were not properly referring back to Latrobe those patients whom Latrobe had referred to WCC for interventional cardiology procedures. Additionally, some Latrobe physicians began accusing WCC doctors, particularly BouSamra and Morcos, of performing improper and medically unnecessary stenting. In light of these accusations, one of the principals of WCC, one of the cardiologists from Latrobe, and the then-Chief Medical Officer of Westmoreland Regional Hospital agreed that Dr. Mahdi Al-Bassam, a skilled interventional cardiologist, would perform a review of WCC's procedures.

On April 26, 2009, Dr. Al-Bassam issued a report concluding that the accusations made against WCC were unfounded. In fact, Dr. Al-Bassam found that the interventional cardiologists demonstrated outstanding skills and judgment, and found no evidence of misuse or abuse of interventional cardiology. He further concluded that the procedures performed by WCC involved no increased complications or mortality.

In February 2010, Robert Rogalski (Rogalski) was appointed CEO of Excela, at which point he became aware of the acrimonious relationship between WCC and Latrobe. Seeking to control the market for interventional cardiology in Westmoreland County, Rogalski began negotiating with WCC intending to bring WCC into Excela's network. The negotiations were ultimately unsuccessful, and in April 2010, WCC rejected any further negotiations.

In June 2010, Excela engaged Mercer Health & Benefits, LLC (Mercer) to review whether physicians at Westmoreland Regional Hospital, including BouSamra, were performing medically unnecessary stenting. Mercer's review was based on a sampling

of interventional cardiology procedures. The results of the study were critical of BouSamra's work, and concluded that he had performed medically unnecessary interventional cardiology procedures.

BouSamra received the results of the Mercer peer review on December 18, 2010. On January 11, 2011, BouSamra resigned his privileges at Westmoreland Regional Hospital, hoping to minimize negative professional repercussions resulting from the peer review study. Prior to resigning, however, BouSamra had already gained provisional privileges to perform coronary interventions at Forbes Regional Hospital, which served patients in Westmoreland County and eastern Allegheny County.

On February 9, 2011, Excela hired American Medical Foundation for Peer Review and Education, Inc., (American) to conduct a more thorough peer review focusing on interventional cardiology procedures performed specifically by BouSamra in 2010. The stated goal of the American study was to determine if any of the procedures BouSamra performed at Excela's hospital were medically unnecessary.

While Mercer was completing its peer review but prior to American beginning its peer review, Excela contracted with an outside public relations consultant, Jarrard, Phillips, Cate & Hancock (Jarrard), to assist Excela in managing the anticipated publicity stemming from the results of the peer review studies. Molly Cate (Cate) was the principal at Jarrard who worked on the Excela media plan and frequently communicated with Excela through Timothy Fedele (Fedele), who was Excela's Senior Vice-President and General Counsel during the relevant events. Cate also worked with other members of Jarrard as part of the team handling Excela's media plans, including Kim Fox (Fox), Alan Taylor (Taylor), and Magi Curtis (Curtis). On February 23, 2011, American issued a final report to Excela in which it concluded that BouSamra and Morcos regularly overestimated arterial blockages and inappropriately implanted stents.

On February 25, 2011, Excela informed Cate that legal concerns prevented it from publically naming BouSamra as one of the doctors alleged to have implanted medically unnecessary stents. The next day, outside counsel sent legal advice by email to Fedele. Fedele forwarded that email to Cate and other employees at Excela. Cate subsequently forwarded that same email to Fox, Taylor, and Curtis--Jarrard employees working on Excela matters with Cate. On February 28, 2011, Excela informed Cate that, contrary to its position taken two days earlier, it was planning to publically identify BouSamra and Morcos as the cardiologists responsible for over-stenting.

On or about March 2, 2011, Excela held a press conference and publicly acknowledged the results of the peer review studies. In its press release, Excela stated that the peer review process had identified 141 patients of BouSamra and Morcos who, in the last twelve months, had received stents which may not have been medically necessary. The press conference received significant media attention the following day. *See* Excela Health Press Release, *Excela Health Launches Medical Necessity Review of Coronary Stent Procedures*, March 3, 2011.

BouSamra initiated this action by filing a complaint on March 1, 2012, seeking damages for, among other things, defamation and interference with prospective and actual contractual relations. As the matter continued through the phases of litigation, the parties disagreed as to the scope of discoverable materials. On November 18, 2014, Marvin A. Fein, Esquire, was appointed Special Master to resolve all discovery disputes. *See* Order of Court, Nov. 18, 2014. In anticipation of resolving the discovery problems, Appellants (referred to collectively as Excela)[2] created a privilege log of materials it

---

[2] In this appeal, Appellants include Excela Health; Westmoreland Regional Hospital; Robert Rogalski; Jerome E Granato, M.D.; Latrobe Cardiology Associates, Inc.; Robert N. Staffen, M.D.; Mercer Health & Benefits, LLC; and American Medical Foundation for Peer Review and Education, Inc.

asserted were protected from discovery. This privilege log included the February 26, 2011 email from outside counsel to Fedele, which Fedele forwarded to Excela management-level personnel and Cate, who in turn forwarded it to other Jarrard employees. The log also included various other emails among the members of the Jarrard team. In the interest of brevity, we will refer to these documents as the "Jarrard documents," as the Superior Court did below.

BouSamra filed a motion to compel Excela to produce the Jarrard documents on April 6, 2015. Excela responded by claiming that both the attorney-client privilege and the work product doctrine applied, barring discovery of the Jarrard documents. Appellees argued, however, that both privileges were waived when Fedele forwarded outside counsel's email to Cate because Cate was a third party outside the attorney-client relationship.

After conducting an *in camera* review of the documents, Special Master Fein issued a report on May 16, 2015, wherein he recognized that "it is likely that the contents of these documents will be disclosed at some point in this proceeding." Special Master's Report at 6, May 16, 2015. Special Master Fein reasoned, however, at that point in the proceedings, Excela had not waived any privilege which would render the documents discoverable. *Id.* In a proposed order of court issued by Special Master Fein, he recommended that "Plaintiff's Motion for Defendants to produce correspondence dated on or about February 26, 2011, between Excela's outside counsel, inside counsel, and [Jarrard], Excela's agent, [be] denied."[3] Proposed Order of Court issued May 16, 2015, ¶5.

---

[3] Special Master Fein did not provide any legal analysis in concluding that the emails were protected by the attorney-client privilege. Further, he did not address the applicability of the attorney work product doctrine.

BouSamra filed exceptions to Special Master Fein's report and proposed order on June 3, 2015, and filed a supporting brief on July 6, 2015. After reviewing the emails *in camera*, on October 6, 2015, the trial court sustained BouSamra's exception regarding the Jarrard documents. Memorandum and Order of Court, October 6, 2015. The trial court reasoned that communications between counsel and a third party are generally not protected by the attorney-client privilege; in fact, the court reasoned, the privilege is lost when a protected communication is shared with a third person. *Id.* Although the court did recognize that an exception may exist where a third party is acting as an agent of a lawyer and is facilitating the lawyer's representation, the court held that exception was inapplicable because employees of Jarrard "were not agents of defendants' counsel facilitating the representation." *Id.* at 1-2 (citing RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 70 (2000)). Rather, the court reasoned, Excela retained Jarrard to assist in public relations matters. Thus, the court concluded:

> It was not the role of defendants' counsel to make decisions regarding communications with the public. At the most, a lawyer will give advice to a client asking the lawyer to advise it regarding the legal issues with respect to communications with the public. The presence of Jarrard would not in any way assist counsel in giving such legal advice.

*See id.* at 2. Neither Special Master Fein nor the trial court addressed the applicability of the attorney work product doctrine. Excela appealed the trial court order, asserting that both the attorney-client privilege and the work product doctrine barred discovery of the Jarrard documents.

On July 19, 2017, a unanimous panel of the Superior Court affirmed. *BouSamra v. Excela Health*, 167 A.3d 728 (Pa. Super. 2017). In considering whether the work product doctrine applied to the Jarrard documents, the Superior Court recognized that the privilege bars discovery of materials which disclose the mental impressions, conclusions, or opinions of a party's attorney. *Id.* at 743 (citing Pa.R.C.P. 4003.3). The panel first

looked to whether Excela properly raised the doctrine by delineating facts showing that the privilege had been properly invoked. *Id.* The Superior Court concluded that Excela failed to meet this burden because the doctrine protects the files of counsel from examination, not documents or property which belong to the client. *Id.* (citing Pa.R.C.P. 4003.3, Explanatory Comment-1978). The court reasoned that BouSamra was attempting to discover an email directly from the client, not the client's attorney. *Id.* Further, that email, as found by the Superior Court, is a document that belonged to Excela, not outside counsel. *Id.* Additionally, the panel noted that Excela did not send the documents to Jarrard to help outside counsel prepare for litigation. *Id.* at 744. On these bases, the Superior Court reasoned, the work product doctrine was inapplicable. *Id.*

Next, the court considered whether the Jarrard documents were protected by the attorney-client privilege. The court first recognized that, as a communication between outside counsel and Fedele, the email was initially protected by the attorney-client privilege. *Id.* at 735, n.4. Thus, the court considered whether the privilege was waived by disclosure, or whether the privilege should be extended to Jarrard, an agent of Excela, the client.

Relying on *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), the Superior Court opined the attorney-client privilege may extend to a client's agent when the presence of an agent is necessary or useful to the lawyer's dissemination of legal advice. *Id.* at 737. The court concluded, however, that *Kovel* is inapposite in this case because Jarrard was not involved in outside counsel's dissemination of legal advice. Specifically, Jarrard did not assist outside counsel in providing legal advice to Excela:

> That, of course, is the "legal issue" involved in the case.
> Outside counsel reviewed the materials sent by Mr. Fedele
> and outside counsel rendered advice as to their contents.

> Outside counsel sent his advice only to in-house counsel.
> Outside counsel's email does not solicit input.

*Id.* at 739. In fact, the Superior Court recognized that none of the Jarrard employees responded directly to outside counsel in that email chain. *Id.* at 739-40. Thus, based on this factual record, the court concluded that it was unnecessary for it to determine whether an agent of the client is under the umbrella of attorney-client privilege pursuant to *Kovel*.

Appellants filed a petition for allowance of appeal with this Court. We granted allocatur to consider two issues, which as stated by Appellants, are:

> (1) Did the Superior Court commit an error of law when holding that a client waives the work-product protection of its counsel's pre-litigation e-mail by forwarding the e-mail to its public relations consultant?

> (2) Did the Superior Court commit an error of law when holding that, to qualify as a privileged person within the attorney-client privilege, a third party must provide legal advice and have the lawyer or client control its work?

*BouSamra v. Excela Health*, 179 A.3d 1079 (Pa. 2018) (per curiam). The application of the work product doctrine and the attorney-client privilege are questions of law over which our standard of review is *de novo* and our scope of review is plenary. *In re Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 215 (Pa. 2014).

Initially, Excela argues that the email chain should not be subject to discovery because it is protected as attorney work product. Excela's Brief at 26. Relying on several secondary sources and decisions from other courts, Excela contends that the real purpose of the work product doctrine is to protect evidence from disclosure to opposing counsel, not the outside world generally. In Excela's view, application of the work product doctrine is not waived unless work product is disclosed to the adversary or if the disclosure increases the likelihood that an adversary will discover the work product. Excela maintains that the protection should remain regardless of whether the attorney or client makes the disclosure. *Id.* at 30.

Next, Excela asserts that Rule 4003.3 does not require that documents protected by the work product doctrine be prepared in anticipation of litigation, as that requirement is not included in the text of the rule. In support, Excela relies on two cases from our intermediate courts which, it argues, both hold that the protections of Rule 4003.3 are not limited to work product produced in anticipation of litigation. *See Estate of Paterno v. NCAA*, 168 A.3d 187, 200 (Pa. Super. 2017) (noting "the Rule does not limit work product protections to materials prepared in anticipation [of litigation]."); *Bagwell v. Pa. Dept. of Educ.*, 103 A.3d 409, 416 (Pa. Cmwlth. 2014) ("The anticipation of litigation part of the work-product doctrine is not an absolute requirement[.]"). Further, Excela contends that although the words "anticipation of litigation or trial" do appear in the statute, they are used as words of inclusion rather than exclusion. Excela's Brief at 31-32.

Lastly, Excela argues that the core policy and purpose of the work product doctrine is to protect an attorney's mental impressions from disclosure to an adversary. In this case, Excela contends that the February 26, 2011 email unquestionably contains the mental impressions of the attorney. Thus, in furtherance of the purpose of rule, Excela argues that the email must be protected as work product. *Id.* at 33-34.

Conversely, BouSamra contends that in this case, the work product privilege either does not apply, or was waived by disclosure. First, BouSamra argues that the February 26, 2011 email is not protected by the work product doctrine because he sought to obtain the email chain from Jarrard, not Excela's counsel. Relying on the comment to the rule, BouSamra explains that documents belonging to the client are explicitly excluded from the definition of attorney work product. Thus, in this case, BouSamra argues that because he is attempting to recover documents from Jarrard and not from Excela's attorney, the documents cannot possibly be considered attorney work product. BouSamra's Brief at 26-28.

BouSamra next argues that neither Cate nor any other Jarrard employees provided insight or advice to the attorney while crafting the message. Thus, although BouSamra recognizes that Rule 4003.3 protects the work product of a party's representative,[4] BouSamra alleges that the documents cannot be considered Jarrard's work product, because Jarrard did not advise the lawyer on their creation. Similarly, BouSamra contends that Jarrard cannot be construed to be an agent of Excela, because Jarrard is a separate legal entity with other clients and was hired by Excela for a specific public relations project.

Next, BouSamra contends that Excela's disclosure of the email to Jarrard increased the likelihood that he, an adversary, would obtain the document. Thus, even relying on the broadly interpreted waiver rule Excela urges us to adopt, BouSamra contends he should still be permitted to obtain the document because disclosure to Jarrard increased the likelihood that the document would be obtained by an adversary. BouSamra's Brief at 33.

Finally, BouSamra contends that Excela's suggested rule will lead to an absurd result because it would permit attorney work product to be shared with virtually anyone except an adversary without waiving the privilege. In BouSamra's view, such a rule is too broad, unreasonable, and unsupported by the law. Rather, BouSamra urges this Court to adopt a more practical waiver analysis, which requires reasonable measures be taken to protect an attorney's work product. BouSamra's Brief at 38-39.

In its reply brief, Excela contends that the language of Rule 4003.3 is clear in that it protects the mental impressions of attorneys along with the mental impressions of the

---

[4] Rule 4003.3 states, in relevant part: "With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics." Pa.R.C.P. 4003.3.

"representative of a party . . . respecting strategy or tactics." Pa.R.C.P. 4003.3. In this regard, Excela maintains that not only is the email sent by counsel privileged work product, but the commentary of Jarrard employees--acting as a representative of Excela--should be protected work product as well. Excela's Reply Brief at 7-9. Finally, Excela explains that contrary to BouSamra's framing of its position, it is not advocating that the work product doctrine can only be waived by disclosure to an adversary. Rather, Excela concedes that "widely disseminating the work product may result in work product waiver." Excela's Reply Brief at 10. Notwithstanding this position, however, Excela relies on the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS, § 91 cmt. b (2000), for the proposition that application of the work product doctrine should not be deemed waived when the work product is shared with agents, representatives, or other professionals working for the client. Excela's Reply Brief at 10.

Initially, we recognize "that evidentiary privileges are not favored." *Commonwealth v. Stewart*, 690 A.2d 195, 197 (Pa. 1997) (observing "[e]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."). Courts should permit utilization of an evidentiary privilege "only to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Id.* (quoting *In re Grand Jury Investigation*, 918 F.2d 374, 383 (3d Cir. 1990)). Additionally, unlike the attorney-client privilege, the protection flowing from the work product doctrine belongs to the attorney, not the client. *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851, 866 (3d Cir. 1994); *Burnham v. Cleveland Clinic*, 89 N.E.3d 536, 541 (Oh. 2016); *see also Magnetar Tech. Corp. v. Six Flags Theme Park, Inc.*, 886 F.Supp.2d 466, 479 (D. Del. 2012) ("[T]he work product protection belongs to the attorney.").

This Court has not yet articulated the proper analysis for waiver of the attorney work product doctrine in Pennsylvania. *See LaValle v. Office of Gen. Counsel*, 769 A.2d 449, 460 n.16 (Pa. 2001) (noting "we decline to undertake an assessment of the appropriate waiver analysis generally applicable to the work product doctrine in Pennsylvania."). Other courts tasked with shaping a principled waiver analysis of the work product doctrine first consider the purpose of the privilege, because when the purpose is no longer being furthered, the privilege must yield to the truth seeking process. *In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011) ("[P]rivileges should be recognized only when necessary to achieve their respective purposes."); *Fisher v. U.S.*, 425 U.S. 391, 403 (1976) (noting that a privilege "applies only where necessary to achieve its purpose."). Notwithstanding Justice Donohue's classification of this discussion as dicta, we find a brief review of the scope and applicability of the work product doctrine critical to discerning the full purpose of the protection, which in turn is a worthwhile step for developing a waiver analysis.[5]

The privilege emanating from the work product doctrine is codified in Pennsylvania Rule of Civil Procedure 4003.3:

> Subject to the provisions of Rules 4003.4 and 4003.5, a party may obtain discovery of any matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her attorney, consultant, surety, indemnitor, insurer or agent. The discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories. With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the

---

[5] We recognize that dicta is generally regarded as information in an opinion which is "not necessary to the determination of the case." *In re L.J.*, 79 A.3d 1073, 1079 (Pa. 2013). In order to articulate a proper waiver analysis for the work product doctrine, we must first determine the applicability and scope of the doctrine.

> value or merit of a claim or defense or respecting strategy or tactics.

Pa.R.C.P. 4003.3. The explanatory comment further clarifies the scope of the Rule:

> The essential purpose of the Rule is to keep the files of counsel free from examination by the opponent . . . . Documents, otherwise subject to discovery, cannot be immunized by depositing them in the lawyer's file. The Rule is carefully drawn and means exactly what it says. It immunizes the lawyer's mental impressions, conclusions, opinions, memoranda, notes, summaries, legal research and legal theories, nothing more.

*Id.* (Explanatory Comment-1978). The purpose of the work product doctrine is to protect the mental impressions and processes of an attorney acting on behalf of a client, regardless of whether the work product was prepared in anticipation of litigation. *Lepley v. Lycoming Cnty. Court of Common Pleas*, 393 A.2d 306, 310 (Pa. 1978) (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975)).[6] Work product protection "provid[es] a

---

[6] Rule 4003.3 makes clear that work product protection is not confined to materials prepared in anticipation of litigation, as the text utilizes the phrase "even though prepared in anticipation of litigation or trial" as a term of inclusion, not exclusion. Pa.R.C.P. 4003.3; *Estate of Paterno*, 168 A.3d at 200 ("Thus, the Rule does not limit work product protection to materials prepared in anticipation [of litigation]. Rather, materials prepared in anticipation are not automatically protected."); *Bagwell*, 103 A.3d at 416 (the anticipation of litigation language "does not limit the doctrine to *only* materials prepared in anticipation of litigation. Rather, materials prepared in anticipation of litigation constitute an example of the doctrine's coverage.").

In her concurrence, Justice Donohue suggests that the work product privilege should be limited to work-product prepared in anticipation of litigation. Such a reading, however, does not comport with the plain language of the rule. Justice Donohue supports her conclusion with a comparison to the federal rule governing the work product doctrine, and notes that this Court "did not recognize any intent to differentiate our rule from its federal counterpart in this manner." Justice Donohue's Concurrence at 2 n.1. This line of reasoning, however, fails to mention that Federal Rule 26(b)(3)(A) explicitly states "a party may not discover documents and tangible things that are prepared in anticipation of litigation[.]" As both the *Bagwell* court and *Paterno* court recognized, Rule 4003.3 does not include similar mandatory language requiring the materials be prepared in anticipation of litigation. *Paterno*, 168 A.3d at 200; *Bagwell*, 103 A.3d at 416-17. If only work product created in anticipation of litigation were protected, then the privilege would only apply to

privileged area within which [an attorney] can analyze and prepare [a] client's case . . . by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Barrick v. Holy Spirit Hosp. of the Sisters of Christian Charity*, 32 A.3d 800, 812 (Pa. Super. 2011), *aff'd* 91 A.3d 680 (Pa. 2014) (quoting *T.M. v. Elwyn, Inc.*, 950 A.2d 1050, 1062 (Pa. Super. 2008)); *accord Commonwealth v. Kennedy*, 876 A.2d 939, 948 (Pa. 2005) ("[W]e agree with the proposition that the doctrine promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against them.") (internal citations omitted).

As is clear from the text of the rule as well as the jurisprudence surrounding the work product doctrine, confidentiality is not a cornerstone of the accompanying privilege. Pa.R.C.P. 4003.3; *Bagwell*, 103 A.3d at 417-18 (contrasting the attorney-client privilege, which flows from confidential communication, to the attorney work product doctrine, which does not) ; *U.S. v. Am. Telephone & Telegraph Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) ("[T]he work product privilege does not exist to protect a confidential relationship"); *U.S. v. Massachusetts Inst. of Tech.*, 129 F.3d 681, 687 (1st Cir. 1997) ("the [attorney-client privilege] . . . is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege; by contrast, work product protection is provided against adversaries[.]"); *see also Barrick*, 91 A.3d at 687 (Baer, J., Opinion in Support of Affirmance) ("If [an attorney work product] document was sent to the expert witness, it would be protected by Rule 4003.3's work product provision."). In fact, some courts and commentators have suggested that the minority of courts finding waiver of the work product doctrine on the basis of disclosure are confusing the work product and attorney-client privileges. *See Kittitas Cnty. v. Allphin*, 416 P.3d 1232, 1243 n.13 (Wash. 2018) ("While it does not appear that any states or federal courts have officially adopted

litigation attorneys, and would not protect attorney memoranda, drafts of transactional documents, or other non-litigation material. *Bagwell*, 103 A.3d at 417.

the same standard of waiver for both the attorney-client privilege and work product protection, the standards for waiver are sometimes conflated.") (citing 8 Wright & Miller, Fed. Prac. & Proc. (civ.), *The Work-Product Rule - Matters Protected by the Work-Product Rule* § 2024 (3d. ed. April 2017)). Accordingly, because the purposes of the attorney-client privilege and the work product doctrine are different, the waiver analysis for each rule necessarily diverges as well. *See Allphin*, 416 P.3d at 1243 ("The different standards of waiver for the attorney-client privilege and work product protection result from the differing purposes behind the doctrines.").

Whereas disclosure to a third party generally waives the attorney-client privilege,[7] the same cannot be said for application of the work product doctrine because disclosure does not always undermine its purpose. *See Bagwell, supra*; *Allphin*, *supra*. As the purpose of the doctrine must drive the waiver analysis, we hold that the work product doctrine is waived when the work product is shared with an adversary, or disclosed in a manner which significantly increases the likelihood that an adversary or anticipated adversary will obtain it. This waiver rule comports with the prevailing view in state and federal courts across the country, and the rule's fact intensive structure requires evaluation on a case-by-case basis. *Allphin*, *supra*; *Am. Zurich Ins. Co. v. Mont. Thirteenth Judicial Dist. Court*, 280 P.3d 240, 248 (Mont. 2012) ("Disclosure only waives

---

[7] *Joe v. Prison Health Servs., Inc.*, 782 A.2d 24, 31 (Pa. Cmwlth. 2001) ("[O]nce the attorney-client communications have been disclosed to a third party, the privilege is deemed waived."); *Nationwide Mut. Ins. Co. v. Fleming*, 992 A.2d 65, 68 (Pa. 2010) (Eakin, J., Opinion in Support of Affirmance) (recognizing waiver of attorney-client privilege upon disclosure to a third-party). Disclosure does not, however, always mandate waiver of attorney-client privilege. *See Commonwealth v. Harris*, 32 A.3d 243, 252-53 (Pa. 2011) (attorney-client privilege extended to testifying expert); *Commonwealth v. Noll*, 662 A.2d 1123, 1126 (Pa. Super. 1995) (attorney-client privilege extended to accident reconstruction expert privy to confidential information); *Commonwealth v. duPont*, 730 A.2d 970, 977 (Pa. Super. 1999) (recognizing that "the attorney-client privilege does extend to an agent of an attorney who assists in the provision of legal advice to the client.").

the work product protection if it is inconsistent with the maintenance of secrecy from the disclosing party's adversary.") (quoting *U.S. v. Deloitte*, 610 F.3d 129, 140 (D.C. Cir. 2010); *Fox v. Alfini*, 432 P.3d 596, 604 (Colo. 2018) (Hood, J., concurring) ("[V]oluntary disclosure of information to third parties does not ordinarily constitute a waiver of exemption from discovery under the work product doctrine, unless such disclosure is to an adversary in the litigation[.]"); *Chevron*, 633 F.3d at 165 ("it is only in cases in which the material is disclosed in a manner inconsistent with keeping it from an adversary that the work-product doctrine is waived."); *Blattman v. Scaramellino*, 891 F.3d 1, 5 (1st Cir. 2018) (same); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 91(4) (2000) ("Work-product immunity is waived if the client, the client's lawyer, or another authorized agent of the client . . . discloses the material to third persons in circumstances in which there is a significant likelihood that an adversary or potential adversary in anticipated litigation will obtain it.").

After an *in camera* review of the Jarrard documents, it is readily apparent that the email from outside counsel to Fedele constituted attorney work product.[8] The critical inquiry, then, is whether the work product doctrine was waived. We recognize that a fact intensive analysis is required to determine whether Fedele sending outside counsel's email to Cate "significantly increased the likelihood that an adversary or potential adversary would obtain it." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 91(4) (2000). Courts tasked with analyzing similar factual situations generally consider whether the disclosure was "inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Deloitte*, 610 F.3d at 140. In evaluating the maintenance of secrecy

---

[8] Given the confidential nature of the documents at issue, we are precluded from publicly analyzing the specific contents of the emails, and fully explaining why the emails qualify as attorney work product, but the emails clearly contain the mental impressions, conclusions, and opinions of counsel.

standard, a lower court should consider whether a reasonable basis exists for the disclosing party to believe "that the recipient would keep the disclosed material confidential." *Id.*

The level of confidentiality, however, should not be conflated with the heightened level of confidentiality required under the attorney-client privilege. Indeed, "while the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege." *Am. Tel. & Tel. Co.*, 642 F.2d at 1299. Commentators have recognized the confusion which can follow in comparing the confidentiality associated with attorney-client privilege and the work product doctrine.

> There are some cases that suggest that any disclosure of a document to a third person waives the work-product immunity to which it would otherwise be entitled. Decisions to this effect confuse the work-product immunity with the attorney-client privilege. The attorney-client privilege has its basis in the confidential nature of the communication and the reason for the privilege ordinarily ceases to exist if confidentiality is destroyed by voluntary disclosure to a third person. But the purpose of the work-product rule is not to protect the evidence from disclosure to the outside world but rather to protect it only from the knowledge of opposing counsel and his client, thereby preventing its use against the lawyer gathering the materials.

*The Work-Product Rule - Matters Protected by the Work-Product Rule* § 2024 (3d. ed. April 2017) (citations and quotations omitted). Attorney work product need be kept confidential only from the adversary. *Fox*, 432 P.3d at 604; *Allphin*, 416 P.3d at 1243; *Massachusetts Inst. of Tech.*, 129 F.3d at 687 ("the [attorney-client privilege] . . . is designed to protect confidentiality, so that any disclosure outside the magic circle is inconsistent with the privilege; by contrast, work product protection is provided against adversaries[.]").

In this case, the factual record is insufficient for us to conduct a waiver analysis. Accordingly, we remand to the trial court for factual findings and application of the newly articulated waiver analysis,[9] as it is not an appellate court's function to engage in fact finding. *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("If the Court of Appeals believed that the District Court had failed to make findings of fact essential to a

---

[9] In her concurrence, Justice Donohue stresses that "[t]he manner in which Fedele disseminated the work product will thus be an important, if not dispositive, consideration in deciding whether a finding of waiver is in order." Justice Donohue's Concurrence at 7. While we agree that the manner of dissemination is an important consideration in applying the broader test we articulate, we do not agree with Justice Donohue's suggestion that the manner of dissemination should be dispositive in this case. The record as it stands before this Court is clear regarding the manner in which the documents were disclosed: Fedele forwarded an email from outside counsel to Cate, who in turn forwarded it to the Jarrard team. If the manner of disclosure in this case were dispositive of the legal question herein, we would not need to remand for additional fact finding and application of the test. In our view, Justice Donohue's approach focuses too heavily on the confidential treatment of the documents in question and the maintenance of secrecy from the outside world generally, and does not focus on confidentiality as it relates to actual or anticipated adversaries. Further, we find that Justice Donohue's approach conflates the standards of confidentiality between the work product doctrine and the attorney-client privilege. *See* discussion *supra*, at 18; *Wynn Resorts, Ltd. v. Eighth District Court in and for Cnty. of Clark*, 399 P.3d 334, 349 ("Unlike the attorney-client privilege, selective disclosure of work product to some, but not to others, is permitted.")

In any event, dissemination of work product to third parties does not always have to be accompanied with instruction on confidentiality. *In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982) ("[B]ecause [the work product doctrine] looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality, the work product privilege is not automatically waived by any disclosure to a third party."); *see also Allphin*, 416 P.3d at 1242 ("Since the purposes of the work product doctrine and the attorney-client privilege are different, it should come as no surprise that standards for waiving attorney-client privilege and work product protection are also different. The work product protection permits disclosure to some, but not all, third parties.") Depending on the facts of a given case, the disclosing party may have a reasonable basis to believe that the recipient will not disseminate the material to actual or anticipated adversaries, regardless of the explicit inclusion of instructions on confidentiality. *Deloitte*, 610 F.3d at 140. As we have made clear, the waiver rule articulated herein relies on a fact-intensive analysis. *Supra*, at 17-18. As such, when analyzing waiver, it is for the trial court to determine which facts and circumstances should bear the most weight in any given analysis.

proper resolution of the legal question, it should have remanded to the District Court to make those findings . . . [the Court of Appeals] should not simply have made factual findings on its own.")

We must now review the second issue upon which we granted review, specifically, whether the attorney-client privilege protects the documents in question. Excela argues that the attorney-client privilege should extend to the email from Fedele to Jarrard because Jarrard is, as Excela claims, an agent or representative of Excela. Had Fedele conferred internally with a public relations employee within the company, Excela argues any claim of waiver would not be colorable. Moreover, Excela asserts that it is inconsistent and unsound policy to permit a private attorney to discuss legal strategy with consultants and agents while barring in-house and government lawyers from doing the same. In support of this position, Excela relies on *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), which it describes as a "landmark opinion" concerning the scope of attorney-client privilege. Excela's Brief at 42.

In *Kovel*, a law firm hired a former Internal Revenue Service agent to assist an attorney in the provision of legal advice to a client who was being investigated for income tax violations. *Kovel*, 296 F.2d at 918. Kovel, the former IRS agent, was subpoenaed and asked about communications he had with the client during the client's conversations with the attorney and Kovel. *Id.* at 919. Kovel refused to disclose any communications and was eventually held in contempt of court. *Id.* at 920.

On appeal, the Second Circuit vacated Kovel's sentence. *Id.* at 924. Holding that the attorney-client privilege protected the communications between the client and Kovel, the court compared Kovel's expertise as an accountant to a third party interpreter:

> Accounting concepts are a foreign language to some lawyers
> in almost all cases, and to almost all lawyers in some cases.
> Hence, the presence of an accountant, whether hired by the
> lawyer or by the client, while the client is relating a

> complicated tax story to the lawyer, ought not destroy the privilege . . . [because] the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and lawyer which the privilege is designed to permit. . . . What is vital to the privilege is that the communication be made for the purpose of obtaining legal advice from the lawyer.

*Id.* at 922.

Here, Excela asserts that Jarrard played a similar role to the accountant in *Kovel*, in that Jarrard and its employees facilitated the procurement of legal advice between Excela and its attorney. In this regard, Excela urges this court to expand the attorney client privilege to include confidential communications between the client, lawyer, and either parties' representative. Excela's Brief at 43-44. This interpretation of the attorney-client privilege, Excela contends, is consistent with at least 15 other states' rules of evidence governing the attorney-client privilege. Excela's Brief at 46.[10] Moreover, Excela notes several federal district court cases which have treated communications between in-house counsel, outside counsel, and public relations firms as protected under the attorney-client privilege. Excela's Brief at 49-54.[11] Relying on this precedent, Excela argues that the demands of modern legal practice require that lawyers' communications with public relations experts, particularly in the face of a public crisis, remain confidential.

---

[10] Excela cites to the following states' rules of evidence as examples of rules based on proposed Rule 502: Ala.R.E. 502; Ark.R.E. 502; De.R.E. 502; Haw.R.S. § 626-1, R. 503; Idaho.R.E. 502; Ky.R.E. 503; Mass.G.E. § 502; Me.R.E. 502; Miss.R.E. 502; N.H.R.E. 502; N.D.R.E. 502; 12 Okla.S. § 2502(B); S.D. Codified Laws § 19-19-502(b); Tex.R.E. 503(b); Vt.R.E. 502.

[11] Specifically, Excela cites to: *F.T.C. v. GlaxoSmithKline*, 294 F.3d 141 (D.C. Cir. 2002) (holding that attorney-client privilege extended to counsel's communications with outside public relations and government affairs consultants); *Copper Market*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) (holding that communications between public relations firm, in-house counsel, and outside counsel are shielded from discovery under the attorney-client privilege); *Schaeffer v. Gregory Vill. Partners, L.P.*, 78 F.Supp.3d 1198, 1202-04 (N.D. Cal. 2015) (holding that attorney-client privilege extended to communications between counsel and public relations consultant because public relations consultant was a "functional employee" of the client).

BouSamra, however, argues that, in order for a communication to be protected under the attorney-client privilege, the communication must be confidentially communicated between the attorney and client. For this reason, BouSamra asserts, Excela's claim of privilege fails, because the communication at issue was disclosed to Cate, a third-party. Thus, according to BouSamra, Excela's assertion of the attorney-client privilege is facially flawed. BouSamra's Brief at 43.

Moreover, aside from the transmittal of the communication to Jarrard employees, BouSamra alleges that the communication was also potentially waived depending on which employees at Excela received the information. Relying on *Red Vision Sys., Inc. v. Nat'l Real Estate Info. Servs., L.P.*, 108 A.3d 54, 60 (Pa. Super. 2015), BouSamra alleges that when dealing with corporations, the attorney-client privilege applies only to the directors, officers, and other individuals who may act on behalf of the corporation. Thus, BouSamra claims, if the communication was made to employees outside of that group, the privilege is waived. On this ground, BouSamra avers that even if Jarrard was acting as an in-house public relations department for Excela, the communication would not be protected by attorney-client privilege. BouSamra's Brief at 48.

Further, BouSamra rejects Excela's reliance on *Kovel*, *supra*, arguing that *Kovel* is inapposite to this case. Specifically, BouSamra alleges that unlike in *Kovel*, where the accountant was required for the effective consultation and communication between the attorney and the client, Jarrard employees were sent the email in question after it was communicated to Fedele. Thus, in this case, BouSamra argues that Jarrard employees were not sent the email in order to effectuate the legal representation, and the lawyer giving the advice did not require the assistance of Jarrard employees in comprehending complex facts, necessitating expert assistance. BouSamra's Brief at 55.

Lastly, BouSamra asserts that Excela's reliance on decisions from other jurisdictions is misplaced for several reasons. First, BouSamra points out that many of the cases Excela cites are interpreting either other states' rules on attorney-client privilege, or are applying the federal rule, which BouSamra alleges is broader in scope than the protections offered by the attorney-client privilege in Pennsylvania. Additionally, BouSamra directs us to several cases, also from other jurisdictions, which purport to reject the *Kovel* standard, or refuse to protect communications between public relations firms and outside counsel. BouSamra's Brief at 56-63.[12]

In its reply brief, Excela alleges that we have approved of the Superior Court's extension of the attorney-client privilege to agents in the criminal context. *Commonwealth v. Harris*, 32 A.3d 243, 253 (Pa. 2011) (citing *Commonwealth v. Noll*, 662 A.2d 1123, 1126 (Pa. Super. 1995)). Thus, Excela claims the same extension should be proffered to agents in civil cases, which, Excela avers, Jarrard is in this case. Excela's Reply Brief at 13-14.

The attorney-client privilege has long been recognized as imperative in effectuating sound legal representation, facilitating honest and frank communication between an attorney and client. *Commonwealth v. Maguigan*, 511 A.2d 1327, 1333-34 (Pa. 1986) ("The attorney-client privilege is deeply rooted in our common law and can be traced to the reign of Elizabeth I, where it was already unquestioned.") (citing 8 J.

---

[12] *Scott v. Chipotle Mexican Grill, Inc.*, 94 F.Supp.3d 585, 592 (S.D.N.Y. 2015) (noting that the "Second circuit's current interpretation of *Kovel* [] is that the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client[]"); *Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 430 (S.D.N.Y. 2013) (recognizing an exception to attorney client privilege under New York law where "communications are made to counsel through a hired interpreter, or one serving as an agent of either attorney or client to facilitate communication.").

Wigmore, *Evidence* § 2290 (McNaughton Rev. 1961)). Today, the modern iteration of

the attorney-client privilege is established in statute:

> In a civil matter counsel shall not be competent or permitted
> to testify to confidential communications made to him by his
> client, nor shall the client be compelled to disclose the same,
> unless in either case this privilege is waived upon the trial by
> the client.

42 Pa.C.S. § 5928. The codification of the privilege is essentially "a restatement of the

common law privilege and its attendant case law interpretations." *Maguigan*, 511 A.2d at

1333.

Courts have consistently recognized that the purpose of the attorney-client

privilege is "to foster the free and open exchange of relevant information between the

lawyer and client." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 47 (Pa. 2011) (citing *Jaffee v.

Redmond*, 518 U.S. 1, 10 (1996); *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981);

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 cmt. c (2000)). Indeed, "the

privilege is grounded in a policy entirely extrinsic to protection of the fact-finding process;"

instead, the interest of trusting, open, and honest attorney-client communications is

paramount. *Estate of Kofsky*, 409 A.2d 1358, 1362 (Pa. 1979). In light of this purpose,

however, the privilege is deemed waived once confidential attorney-client

communications are disclosed to a third party. *Joe v. Prison Health Servs., Inc.*, 782 A.2d

24, 31 (Pa. Cmwlth. 2001); *Nationwide Mut. Ins. Co. v. Fleming*, 992 A.2d 65, 68 (Pa.

2010) (Eakin, J., Opinion in Support of Affirmance).

A party claiming a communication is privileged must set forth facts showing the

privilege was properly invoked. *Nationwide Mut. Ins. Co. v. Fleming*, 924 A.2d 1259, 1266

(Pa. Super. 2007), *aff'd* 992 A.2d 65 (2010). In this regard, the moving party must prove

four elements:

> 1) [t]he asserted holder of the privilege is or sought to become
> a client[;]

2) [t]he person to whom the communication was made is a member of the bar of a court, or his subordinate[;]

3) [t]he communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort[;]

4) [t]he privilege has been claimed and is not waived.

*Id.* at 1264. Upon that showing, the burden shifts to the party seeking disclosure, which must explain why the communication at issue should not be privileged. *Id.*; *see also Custom Designs & Mfg. Co. v. Sherwin-Williams Co.*, 39 A.3d 372, 376 (Pa. Super. 2012).

Where, as here, the client is a corporation, the attorney-client privilege "extends to communications between its attorney and agents or employees authorized to act on the corporation's behalf." *Pa. State Univ. v. W.C.A.B. (Sox)*, 83 A.3d 1081, 1092 (Pa. Cmwlth. 2013); *Red Vision*, 108 A.3d at 60; *Pittsburgh History and Landmarks Found. v. Ziegler*, -- A.3d --, 2019 WL 290010, at *14 (Pa. 2019). This application of the attorney-client privilege is consistent with the prevailing view, and is in accordance with the United States Supreme Court's opinion:

> The administration of the attorney-client privilege in the case of corporations, however, presents special problems. As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation.
>
> *        *        *
>
> The parties in this case agree that, for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors.

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985).

Under the nonbinding authority of *Kovel*, discussed *supra*, some Pennsylvania courts have extended the attorney-client privilege to third parties; specifically, agents of the client or lawyer. *See Commonwealth v. Noll*, 662 A.2d 1123, 1126 (Pa. Super. 1995). In *Commonwealth v. Noll*, Noll was involved in a motor vehicle accident which resulted in the death of a passenger in the other vehicle. *Id.* at 1125. Noll hired an attorney to represent him in a prospective civil suit. *Id.* The attorney subsequently hired an accident reconstruction expert. *Id.* As a result of the expert's findings, Noll elected not to pursue a civil action. *Id.*

Subsequently, the Commonwealth hired the exact same expert to investigate the accident, which led to the Commonwealth charging Noll with homicide by vehicle. Noll filed a *motion in limine*, arguing that the expert's testimony should be precluded from trial. *Id.* at 1125-26. The trial court agreed, and the Superior Court affirmed, reasoning:

> The attorney-client privilege has been part of Pennsylvania law since the founding of the Pennsylvania colony, and has been codified in our statutory law. The attorney-client privilege is not waived where a client allows disclosure to an agent assisting the attorney in giving legal advice to the client. Thus, where legal assistance is rendered by an agent of an attorney, communications are permanently protected from disclosure by the agent, the attorney, or the client, unless waived by the client. As [the accident reconstruction expert] was an agent of [Noll's attorney] hired to assist in providing legal advice to Mr. Noll, the attorney-client privilege was not waived. . . . In the instant case, [the accident reconstruction expert] was retained by [Noll's attorney] to investigate an incident in order to provide legal advice. Therefore, any information regarding [the accident reconstruction expert's] investigation of the accident would be privileged.

*Id.* at 1126 (citations omitted); *accord Commonwealth v. duPont*, 730 A.2d 970, 977 (Pa. Super. 1999) (recognizing that "the attorney-client privilege does extend to an agent of an attorney who assists in the provision of legal advice to the client."). This court has similarly recognized that the attorney-client privilege can, in some circumstances, extend

to a testifying expert as an agent of the lawyer who retained the expert. *Commonwealth v. Harris*, 32 A.3d 243, 252-53 (Pa. 2011) (finding a psychologist who testified on behalf of the defendant was "privy to such confidential attorney-client communications" such that he could not later testify for the Commonwealth in related proceedings).

Here, after careful consideration of the foregoing, we hold that Excela waived the attorney-client privilege. The email in question was sent from Excela's outside counsel to Fedele, the Senior Vice-President and General Counsel of Excela. Thus, as a communication between Excela's attorney and an employee authorized to act on Excela's behalf, the email was originally a protected communication pursuant to the attorney-client privilege. *See Red Vision*, *supra*; 42 Pa.C.S. § 5928.

The critical inquiry, then, is whether Fedele forwarding the email to Cate constituted a waiver of the privilege. As we recognized above, the attorney-client privilege is waived when a confidential communication is shared with a third party. *See Prison Health Servs., Fleming*, *supra*. Cate was an employee of Jarrard, not Excela, and thus under the current iteration of the law, Cate was not capable of acting on Excela's behalf, as she is not an officer, executive, or director of Excela. *See Yocabet v. UPMC Presbyterian*, 119 A.3d 1012, 1028 (Pa. Super. 2015). Accordingly, Fedele could not send the email to Cate as an individual under the ambit of the attorney-client privilege as it applied to Excela and its outside counsel. *Id.*[13] Excela points out, however, that under

---

[13] Because we hold that Excela waived the attorney-client privilege by sending the email in question to Cate, we need not address whether Excela waived the privilege when Fedele sent the communication to other Excela employees. *See Yocabet*, 119 A.3d at 1028 (Pa. Super. 2015) (noting that the board of directors of a corporation, in addition to officers, "can act on [a corporation's] behalf for purposes of application of the attorney-client privilege."). In any event, evaluating this argument is a fact-intensive exercise because a court would be required to determine whether each individual included on the email was a director, officer, or other employee permitted to act on the corporation's behalf. *Id.*; *accord Petrina v. Allied Glove Corp.*, 46 A.3d 795, 799 (Pa. Super. 2012) ("A corporation is a creature of legal fiction which can act or speak only through its officers,

the reasoning of *Noll* and *Kovel*, the privilege should not be waived, as Jarrard and its employees were agents of Excela who were facilitating the lawyer's ability to provide legal advice.

We find this reasoning unpersuasive. In both *Kovel* and *Noll*, the respective third parties--an accountant and an accident reconstruction expert--were privy to confidential information as a necessary means of improving the comprehension between the lawyer and client which facilitated the lawyer's ability to provide legal advice. In *Kovel*, the accountant's presence and opinion were necessary for the lawyer to understand the client's tax story, a prerequisite to furnishing legal advice. *Kovel*, 296 F.2d at 922 ("the presence of an accountant . . . while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege[.]"). Similarly, in *Noll*, the accident reconstruction expert was hired by the lawyer to prepare for possible litigation--again, a step that was required prior to the lawyer being able to give legal advice to the client. *Noll*, 662 A.2d at 1125 (noting that the attorney hired an accident reconstruction expert "to assist in preparation for possible litigation."); *accord Harris*, 32 A.3d at 253 (extending attorney client privilege to expert witness); *duPont*, 730 A.2d at 977 ("[A]ttorneys today often consult with and rely upon the advice of other professionals to assist them in providing legal services. However, application of the privilege requires confidential communications made in connection with providing legal services.").

---

directors, or other agents. Where a representative for a corporation acts within the scope of his or her employment or agency, the representative and the corporation are one and the same entity, and the acts performed are binding on the corporate principal.").

Similarly, it is unclear whether an in-house employee overseeing Excela's communications, marketing, and public relations departments would be an individual capable of acting on behalf of the corporation pursuant to *Red Vision*, *supra*. Thus, we do not analyze the parties' arguments regarding whether Cate should be viewed as an in-house employee or outside consultant, and whether the attorney-client privilege would extend to that hypothetical in-house employee.

In both cases, the critical fact is that the third-party's presence was either indispensable to the lawyer giving legal advice or facilitated the lawyer's ability to give legal advice to the client. That is not the case here. Fedele sending the email in question to Cate, after it was sent to him, did not retroactively assist either outside counsel or Fedele in providing legal advice to Excela. In fact, the email did not solicit advice or input from Cate, nor did the attorney send it to Cate. Thus, this case is not akin to *Kovel* or *Noll*, where the third-party's receipt of information facilitated or improved the lawyer's ability to provide legal advice.[14]

Neither the original email from outside counsel, nor the email from Fedele forwarding that email solicits input, advice, or opinion. That finding is in accordance with Cate's testimony, where she claimed that the decision to name the physicians involved in the alleged stenting scandal was made by Rogalski, Excela's CEO. Deposition of Molly Cate, June 26, 2014, at 135-37. While she testified that she had conversations with upper-level management regarding disclosure of the doctors' identities, that alone, is insufficient to establish that Cate and Jarrard employees were indispensable to outside counsel or Fedele's giving of legal advice to Excela. *Id.* at 135.

---

[14] The lynchpin of the *Kovel* court's reasoning was "whether the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and lawyer which the privilege is designed to permit." *Kovel*, 296 F.2d at 922. This is echoed by the court's foreign language and interpreter example. *Id.* at 921. Whether the subject is foreign accounting concepts or a foreign language, the third-party's presence and knowledge of confidential information is necessary for the lawyer to give legal advice to the client. *Id.* Similarly, in *Noll*, the lawyer solicited the advice and consultation of the accident reconstruction expert to determine whether pursuing a civil action was worthwhile. Unlike the present matter, in all three cases, the third-party's receipt of confidential information was either solicited by the attorney, or necessary for the attorney to give legal advice.

In some situations, a third-party's presence may be necessary for a lawyer to provide legal advice to a client.[15] This is the type of situation that *Kovel* contemplates, where an accountant or interpreter must be present in order to explain foreign concepts or terms. In that situation, the lawyer cannot, or would find it exceedingly difficult, to provide legal advice. That is, however, not the case here, where, upon receiving a privileged communication from an attorney, a client sends that communication to a third-party. As a result, we hold that Excela waived the attorney-client privilege when Fedele, a high ranking officer permitted to act on behalf of the corporation, *see Red Vision*, *supra*, forwarded a privileged communication to Cate, a third-party. Accordingly, the order of the Superior Court is affirmed in part, reversed in part, and this matter is remanded to the trial court for factual findings and application of the attorney work product doctrine consistent with this opinion.

Chief Justice Saylor and Justices Baer and Wecht join the opinion.

Justice Donohue files a concurring opinion in which Justices Todd and Dougherty join.

Justice Wecht files a concurring opinion.

---

[15] Such a situation may, in instances unlike the present matter, involve *soliciting* advice or input from a public relations firm. We acknowledge that, as *Amici* and Excela point out, the modern practice of law, specifically for litigators, can involve managing and utilizing media relations. That involvement, however, does not always require, or permit, the disclosure of confidential information to a media consultant. Thus, while situations may arise that require a public relations firm to provide insight, advice, or opinion on legal advice, the scope of such situations must remain narrowly tailored, as evidentiary privileges remain highly disfavored in Pennsylvania. *Commonwealth v. Stewart*, 690 A.2d 195, 197 (Pa. 1997).