J-A27022-25          2026 PA Super 53

TIFFANY GRIFFIN AND CHAD GREAVES

    v.

THE BRYN MAWR HOSPITAL AND MAIN LINE HOSPITALS, INC. D/B/A THE BRYN MAWR HOSPITAL, JOHN DOE, BRENDA DEFEO, AND DONAHUE FUNERAL HOME OF UPPER DARBY, INC.

APPEAL OF: THE BRYN MAWR HOSPITAL AND MAIN LINE HOSPITALS, INC. D/B/A THE BRYN MAWR HOSPITAL, BRENDA DEFEO

: IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
:
:
:
:
:
:
: No. 3361 EDA 2024
:
:
:
:
:
:
:
:
:
:
:
:
:

Appeal from the Order Entered December 2, 2024
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2022-06086

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

CONCURRING/DISSENTING OPINION BY MURRAY, J.:

**FILED MARCH 19, 2026**

Defendants in this case asserted that four documents relating to the Hospital's mishandling of fetal remains were subject to evidentiary privilege under the Medical Care Availability and Reduction of Error Act (MCARE),[1] and that three of those documents were subject to evidentiary privilege under the

_____

[1] 40 P.S. §§ 1303.101-1303.910.

Patient Safety Quality and Improvement Act (PSQIA).[2]  I join the Majority's conclusion that the four documents are not subject to MCARE's evidentiary privilege.  However, for the reasons that follow, I respectfully dissent from the Majority's conclusion that the three documents are subject to privilege under PSQIA.

I begin by emphasizing that courts generally disfavor evidentiary privileges.  *See Ungurian v. Beyzman*, 232 A.3d 786, 794 (Pa. Super. 2020); *McLaughlin v. Garden Spot Vill.*, 144 A.3d 950, 953 (Pa. Super. 2016) (explaining that evidentiary privileges are disfavored because "they operate in derogation of the search for truth" (citation omitted)).  "Courts should permit utilization of an evidentiary privilege only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *BouSamra v. Excela Health*, 210 A.3d 967, 975 (Pa. 2019) (citation omitted).

Additionally, to provide context, I restate relevant portions of PSQIA. Under PSQIA, patient safety work product is privileged and not subject to discovery.  42 U.S.C.A. § 299b-22(a).  Thus, a party asserting privilege must first establish the information constitutes patient safety work product.  Patient safety work product is defined as follows:

---

[2] 42 U.S.C.A. §§ 299b-21 – 26.

> Except as provided in subparagraph (B), the term "patient safety work product" means any data, reports, records, memoranda, analysis (such as root cause analyses), or written or oral statement--
>
> **(i)** which--
>
> > **(I)** are assembled or developed by a provider for reporting to a patient safety organization and are reported to the patient safety organization; or
> >
> > **(II)** are developed by a patient safety organization for the conduct of patient safety activities;
> >
> > and which could result in improved patient safety, health care quality, or health care outcomes; or
>
> **(ii)** which identify or constitute the deliberations or analysis of, or identify the fact of reporting to, a patient safety evaluation system.[3]

*Id.* § 299b-21(7)(A) (footnote added).  Patient safety work product excludes "information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system."  *Id.* § 299b-21(7)(B)(ii).

Here, it is undisputed that the three documents are not privileged under subsection 299b-21(7)(A)(i).  ***See generally*** Defendants' Brief at 40-52 (arguing only that PSQIA's "deliberations and analysis" privilege applies); ***see also*** Affidavit of Ms. Walsh,[4] 6/7/24, ¶ 12 (conceding that "[t]he documents

---

[3] As defined by PSQIA, "[t]he term 'patient safety evaluation system' means the collection, management, or analysis of information for reporting to or by a patient safety organization."  42 U.S.C.A. § 299b-21(6).

[4] Patricia Walsh, RN, MSN (Ms. Walsh), was the system manager for risk and safety for Main Line Health in October 2018.  Ms. Walsh's affidavit is attached as Exhibit C to Defendants' Response to Plaintiffs' Third Motion for Sanctions.

at issue in this matter were not reported to" the federally-approved patient safety organization with which Hospital had a contract); Defendants' Memorandum of Law in Support of Response to Plaintiffs' Third Motion for Sanctions, 6/10/24, at 19 (stating "Hospital does not contend that the documents in question met the requirements for Section 21(7)(A)(i) [patient safety organization] reporting.").

Under subsection 299b-21(7)(A)(ii), a record constitutes patient safety work product if it "identif[ies] or constitute[s] the deliberations or analysis of, or identif[ies] the fact of reporting pursuant to, a patient safety evaluation system."  42 U.S.C.A. § 299b-21(7)(A)(ii); *see also Boyle v. Main Line Health, Inc.*, 345 A.3d 291, 303 (Pa. Super. 2025) ("Information that constitutes 'patient safety work product' under the 'deliberations and analysis' option set forth in [this subsection] is protected when it is done within the patient safety evaluation system."); *id.* at 304 (clarifying that under this subsection, PSQIA's privilege applies regardless of whether the information was, in fact, reported to a patient safety organization).

As noted by the Majority, Ms. Walsh confirmed that Hospital contracts with a federally certified patient safety organization.  Affidavit of Ms. Walsh, 6/7/24, ¶ 11.  Hospital also has a patient safety evaluation system "for collecting, analyzing, and managing patient safety information … for the purpose of submission to its contracting [patient safety organization] and/or conducting internal deliberation and analysis." *Id.*  Ms. Walsh also alleged the

three documents at issue herein, which she describes as patient safety work product, were prepared "for reporting" to Hospital's patient safety organization. *Id.* ¶ 12. Further, Ms. Walsh averred the three documents constitute "analysis" conducted within Hospital's patient safety evaluation system. *Id.* ¶ 14; *see also id.*, Exhibit B (Patient Safety Evaluation System Policy).[5]

The Majority relies on the assertions in Ms. Walsh's affidavit to conclude the requirements for PSQIA's privilege under subsection 299b-21(7)(A)(ii) had been established. However, in my view, a medical facility's subjective determination that information constitutes patient safety work product under PSQIA is no less self-serving than a medical facility's subjective determination that an issue is reportable as an incident or serious event under MCARE. *See* Majority Op. at 16 (stating that "to allow a medical facility's subjective belief to control, would, in effect, permit a medical facility to use the MCARE privilege as a sword instead of a shield, and make privileged any document it wished not to disclose in litigation.").

I acknowledge that PSQIA provides broader privilege protection than MCARE. I likewise acknowledge that the text of PSQIA includes no requirement that the alleged patient safety work product pertain to a

---

[5] Hospital's patient safety evaluation system policy details Hospital's participation within the patient safety evaluation system and defines patient safety work product in a manner that mirrors the text of PSQIA.

*particular* patient under the provider's care. **See**, **e.g.**, **Shands Teaching Hosp. & Clinics, Inc. v. Beylotte**, 357 So.3d 307, 309 (Fla. Dist. Ct. App. 2023) (concluding a report prepared following a slip-and-fall incident by a hospital <u>visitor</u> was privileged and confidential under PSQIA, because "staff, patients, and visitors alike" could face similar risks in common areas, and noting the potential for improving conditions in common areas relates to improved patient safety). Nevertheless, the stated purpose of PSQIA and the text of its privilege provision make clear that privilege is intended to attach when the deliberations and analysis promote the goal of patient safety. **See Boyle**, 345 A.3d at 303 (explaining that PSQIA was enacted to encourage analysis and discussion of patient safety and health care quality without fear of such evaluations being used in civil litigation); **see also** S. REP. NO. 108-196 (2003) (identifying the purpose of shifting from a culture of culpability to a "'culture of safety' that focuses on information sharing, improved patient safety and quality and the prevention of future medical errors"). With an eye to PSQIA's intended purpose, I cannot agree that, in this particular case, the three documents relate to patient safety or the prevention of future medical errors.

Defendants vaguely assert that tracking tissue in a laboratory implicates patient care and treatment. **See** Defendants' Brief at 48; **see also id.** (likening this matter to an instance of losing biopsied material and potentially delaying cancer treatment). The Majority similarly concludes that "policies

and procedures regarding the storage and tracking of laboratory or pathology specimens that require further testing for patient diagnosis and/or treatment are critical to the health, safety, and quality of care provided by a hospital." Majority Op. at 25. If this matter simply involved tracking tissue within a laboratory, I would be inclined to agree. However, based on the record before this Court, I do not believe this matter involves tracking laboratory specimens which require testing, nor does it relate to patient safety or healthcare outcomes.

The allegations in Plaintiffs' complaint relate exclusively to the mishandling or misplacement of fetal remains, rather than to a laboratory specimen. The deposition testimony of laboratory manager Erin Tretter (Ms. Tretter)[6] and pathology assistant James Moore (Mr. Moore)[7] is useful. Both individuals described the procedure for handling fetal remains based on the fetus's gestational age. Ms. Tretter explained that "products of conception" (which would include remains removed during a surgical procedure such a dilation and curettage or dilation and evacuation) relate to a fetus of less than

_____

[6] Various filings refer to Ms. Tretter as the individual in charge of pathology for Hospital. However, during her deposition, Ms. Tretter testified that in 2018, she "mostly oversaw the operations of the rapid response laboratory. I didn't have any direct oversight of pathology." Deposition of Ms. Tretter, 9/15/23, at 8. Ms. Tretter's deposition is attached as Exhibit D to Plaintiffs' April 30, 2024, Motion for Sanctions and to Compel Re-Deposition of Erin Tretter and James Moore and to Strike Objections of Defense Counsel.

[7] Mr. Moore's deposition is attached to the same motion for sanctions, as Exhibit E.

16 weeks. Deposition of Ms. Tretter, 9/15/23, at 25. In those instances, the products of conception would be taken to the surgical pathology gross room for dissection and diagnosis. Deposition of Mr. Moore, 3/15/24, at 73. Such testing and diagnosis does not require the patient's permission at this early stage. *Id.* at 74. If a family wished to collect the products of conception, they would be picked up from the gross room. Deposition of Ms. Tretter, 9/15/23, at 25.

Ms. Tretter then specifically testified that the fetal remains at issue herein could not be considered a product of conception. *Id.* at 25-26. Rather, with a gestational age of 18 weeks, Tiffany Griffin's (Griffin) fetus was intact. *Id.* Mr. Moore stated that remains from an intact fetus, beyond the requisite gestational age, are taken directly to the morgue. Deposition of Mr. Moore, 3/15/24, at 73. In order to complete any testing on fetal remains at this stage, the patient of record or the patient's personal representative would have to provide explicit permission for a postmortem examination. *Id.* at 73-74.

Thus, where Griffin had carried her fetus to the gestational age of 18 weeks, the above-described policies dictate that absent postmortem permissions, the fetal remains would have been transferred directly to the

morgue.[8]  In their supplemental objections and responses to Plaintiffs' first set for interrogatories, Defendants alleged that following Griffin's dilation and evacuation procedure, a member of the obstetric nursing staff transported the fetal remains from the labor and delivery department to the morgue.  **See** Supplemental Objections and Responses of Defendants to Plaintiffs' First Set of Interrogatories, 6/1/20, at 11.[9]  Ms. Tretter confirmed that the morgue's inventory logs indicated that the fetal remains were located in the morgue. Affidavit of Ms. Tretter, 9/15/23, at 31-32.

By contrast, Defendants stated the placenta was transported from the operating room to the pathology lab.  **See** Supplemental Objections and Responses of Defendants to Plaintiffs' First Set of Interrogatories, 6/1/20, at 12.  Ms. Tretter also confirmed that the pathology laboratory's logs indicated that the placenta had been located in the pathology laboratory, and it had

_____

[8] In their appellate brief, Plaintiffs assert that they declined Hospital's request to donate the fetal remains for testing.  Plaintiffs' Brief at 5.  In support of this statement, Plaintiffs cite to paragraph 21 of their complaint, which, in fact, contains no such averment.  **See** Complaint, 3/5/20, ¶ 21 (paragraph 21 alleges, in its entirety, "While at THE BRYN MAWR HOSPITAL, [Griffin] was presented with paperwork, authorizing the transfer of [the fetal remains] to DONOHUE FUNERAL HOME for purposes of cremation.").  Plaintiffs also stated they declined Hospital's request for fetal testing in support of their motions for sanctions.  **See** Plaintiffs' Brief in Support of Motion for Sanctions, 5/10/24, at 20; Plaintiffs' Memorandum of Law in Support of Plaintiffs' Fourth Motion for Sanctions and to Compel Depositions, 11/19/24, at 16.  From the record, we are unable to ascertain whether Hospital formally requested that Plaintiffs donate the fetal remains for testing.  Nevertheless, it appears to be undisputed that no testing occurred.

subsequently been released to the funeral home. Affidavit of Ms. Tretter, 9/15/23, at 34-36. Defendants asserted that no examination, procedures, or testing were done on either the fetal remains or the placenta. *Id.* at 11-12.

Instantly, the deposition testimony and Defendants' discovery responses make clear that the fetal remains at issue in this matter were never taken to the laboratory for testing or any other procedure. Indeed, per relevant policies, Hospital was not permitted to perform any testing of the fetal remains without Griffin's authorization. Instead, the fetal remains were delivered directly to the morgue, where they remained until after Hospital became aware that the fetal remains were still in the morgue following the pathology laboratory's release of the placenta to the funeral home. Because there was no possibility that the remains at issue would undergo further testing, and they were immediately taken to the morgue for storage following Griffin's procedure, I would conclude the documents created by Hospital after the event do not relate to patient safety (even for a hypothetical, similarly situated patient), and therefore, cannot constitute patient safety work product.

As I would conclude the three documents do not constitute patient safety work product, I would affirm the trial court's order compelling discovery of the documents under PSQIA. For these reasons, I dissent.